E. L. BENNETT v. THE STATE.

No. 4185. Decided November 1, 1916.

Rehearing denied December 20, 1916.

</div>

**1.—Murder—Appeal Bond—Recognizance—Jurisdiction.**

Where, upon trial of murder and a conviction of manslaughter, the appellant instead of entering into a recognizance after giving notice of appeal, entered into an appeal bond while the trial court was still in session for the term, the appeal must be dismissed on motion of the State for want of jurisdiction.

**2.—Same—Statutes Construed—Appeal Bond—Recognizance—Signatures.**

Articles 316 and 317, Code Criminal Procedure, define the terms recognizance and bail bond as used in our code, and one of the differences in the definition of the two terms seems to be that a recognizance is the undertaking of the parties in such case and is not signed but is made a matter of record in the court, while the bail bond is written out and signed by the defendant and his sureties, and where the instrument in question was in the form of a bail bond, signed by

the parties and filed, and was not entered in the minutes of the court, it must be held to be an appeal bond. Following Maxey v. State, 41 Texas Crim. Rep. 556.

### 3.—Same—Amendment—New Recognizance—Practice on Appeal.

Where the appeal was dismissed because the appellant had entered into an appeal bond instead of a recognizance as required by law, he could not be allowed to amend the bond by entering into and filing a recognizance, as this would not be such an instrument as is authorized by law, and is not supplying a defective recognizance entered into during the term time, and gives this court no jurisdiction of the appeal. Following Johnson v. State, 65 Texas Crim. Rep., 416, 143 S. W. Rep., 1165, and other cases.

### 4.—Same—Right of Appeal—Nunc Pro Tunc Judgment.

Where appellant's appeal had been dismissed for want of jurisdiction in not filing his recognizance after notice of appeal, and he thereafter filed a motion in the trial court seeking to correct the judgment so as to give him the benefit of the indeterminate sentence law, and the State filed a reply thereto that said judgment and sentence were valid but prayed in the alternative that if the judgment was not correct, that the court enter the true judgment and sentence theretofore rendered, and the court thereupon found that said judgment did not truly record the said judgment and the sentence pronounced at a former term of the court, and defendant excepted and gave notice of appeal to this court; held, that the appellant had the right of appeal therefrom to this court and is not deprived of his right of appeal by reason of the fact that he failed to perfect his appeal from the entry made at the previous term. Following Maes v. State, 13 Texas Crim. App., 85, and other cases.

### 5.—Same—Rule Stated—Nunc Pro Tunc Judgment—Right of Appeal.

It has been the constant practice of the courts to entertain appeals in criminal as well as in civil cases, where the court below, having omitted to cause the entry of the judgment to be made at the proper term, had caused it to be entered nunc pro tunc at a subsequent·term. Following Scott v. State, 26 Texas 116, and other cases.

### 6.—Same—Void Judgment—Nunc Pro Tunc—Statutes Construed.

The court's power to enter a judgment nunc pro tunc is independent of article 859, Code Criminal Procedure, and appellant's contention that an appeal from a judgment entered nunc pro tunc is not maintainable except in cases where it is entered in lieu of a void judgment, or in cases where no judgment is entered at all, is not well taken. Following Rios v. State, 79 Texas Crim. Rep., 89, 183 S. W. Rep., 151, and other cases. Distinguishing Offield v. State, 61 Texas Crim. Rep., 340, and other cases.

### 7.—Same—Rule Stated—Right of Appeal From Nunc Pro Tunc Judgment.

The rule that where a final judgment nunc pro tunc is entered, it is the conclusion of the trial from which the defendant may prosecute an appeal, is not modified by the case of Ex parte Strey, 28 S. W. Rep., 811, and other cases, and there being nothing in the record to show that appellant has not been in custody, etc., since the entry of the final judgment, the jurisdiction of this court attaches and the case will be considered on its merits.

### 8.—Same—Evidence—Husband and Wife—Diary—Statutes Construed.

Where upon trial of murder and a conviction of manslaughter the defendant introduced a certain diary kept by his wife to show the illicit relations between herself and the deceased, the State should not have been permitted to introduce a diary kept by defendant's wife after the homicide, which was calculated to bring the defendant into great disfavor with the jury, and should have been limited under article 811, Code Criminal Procedure, to such matters as were calculated to throw light upon the issues named; neither was the admission of this testimony permissible under the statute, which interdicts communications between husband and wife and, besides, was purely hearsay of a pronounced nature. Following Woodal v. State, 58 Texas Crim. Rep., 513, and other cases.

9.—Same — Self-defense — Charge of Court — Apparent Danger — Deadly Weapon.

Where, upon trial of murder, there was no evidence that the deceased had a deadly weapon in his possession at the time he was killed, and the defense was purely one of self-defense upon threats and apparent danger, the court's charge on deadly weapons and actual danger was improper, and defendant's requested charge on apparent danger should have been given, and a failure to do so was reversible error.

10.—Same—Charge of Court—Relative Strength of Parties—Disposition of Deceased.

Where the question of relative strength of the parties and the character and disposition of the deceased did not enter into the case in any manner, the court should not have submitted a charge thereon.

11.—Same—Self-defense—Threats—Charge of Court—Standpoint of Defendant.

The court's charge on self-defense which confined defendant's right thereto to the belief of the jury as a predicate for their finding in connection with threats of the deceased, was improper. It is the belief of the defendant at the time which should govern the jury in determining his guilt. ·

12.—Same—Self-defense—Threats—Charge of Court.

Where the court charged self-defense from the standpoint of threats, and the evidence raised the issue of apparent danger independent of the question of threats, the charge on self-defense should have been independent of and disconnected from the charge on threats.

Appeal from the District Court of Bexar. Tried below before the Hon. W. S. Anderson.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

C. A. Keller, R. H. Ward, and John H. Bickett, Jr., for appellant.— On question of cross-examination of wife: Eads v. State, 76 Texas Crim. Rep., 647, 170 S. W. Rep., 145; Johnson v. State, 66 Texas Crim. Rep., 586, 148 S. W. Rep., 328; Roberts v. State, 74 Texas Crim. Rep., 150, 168 S. W. Rep., 100; Downing v. State, 61 Texas Crim. Rep., 519, 136 S. W. Rep., 471, and cases cited in opinion.

On question of charge on self-defense: Swain v. State, 48 Texas Crim. Rep., 98; Edwards v. State, 61 id., 307; McDowell v. State, 55 id., 596; Lundy v. State, 59 Texas Crim. Rep., 131, 127 S. W. Rep., 1032.

E. B. Hendricks, Assistant Attorney General, D. A. McAskill, District Attorney, and Joe H. H. Graham, for the State.—On question of requested charge on self-defense: Link v. State, 73 Texas Crim. Rep., 82, 164 S. W. Rep., 987.

On question of nunc pro tunc judgment: Mendoza v. State, 172 S. W. Rep., 790, and cases cited in opinion. ·

HARPER, Judge.—Under an indictment charging him with murder,

appellant was convicted of manslaughter and his punishment assessed at three years confinement in the penitentiary.

There are several very interesting questions presented in appellant's brief and in the able argument made to the court; but we are met at the threshold with a motion to dismiss the appeal, filed by the Assistant Attorney General, on the ground that this court has no jurisdiction of this appeal, because appellant instead of entering into a recognizance on appeal as required by law, entered into an appeal bond while the court was still in session for the term. This is a jurisdictional question, and if proper steps were not taken to confer appellate jurisdiction on this court, we are powerless to enter any order herein other than to dismiss the appeal.

The instrument copied in the record contains all the essentials of a recognizance, but it is denominated an appeal bond, is signed by the principal and sureties and approved by the sheriff and district judge, and marked filed by the clerk on April 22, 1916. The term of court at which appellant was tried convened March 6, 1916, and adjourned on April 29th, it being thus conclusively shown that appellant entered into the obligation and secured his release during the term of court at which he was convicted.

Appellant's counsel earnestly insists that the instrument, although denominated an appeal bond, and signed by appellant and his sureties and approved by the sheriff, yet it was intended as a recognizance; that it was reduced to writing and signed by appellant and the sureties at the request of the trial judge; that appellant did in fact enter into a recognizance in open court as required by law. Articles 316 and 317 of the Code of Criminal Procedure define the terms "recognizance" and "bail bond" as used in our Code, and one of the differences in the definitions of the two terms seems to be that a recognizance is "the undertaking of the parties in such case, *is not signed,* but is made a matter of record in the court where the same is entered into," while a bail bond is thus defined: "It is written out and signed by the defendant and his sureties."

Owing to the varying contentions in this court, the court instructed the Assistant Attorney General to procure a certificate from the clerk of the District Court of Bexar County as to whether the obligation in this case was ever entered of record in the minutes of the District Court, and the clerk of the District Court certifies over his official signature "that the appeal bond of defendant, E. L. Bennett, has never been entered of record in this office but merely filed." So under no construction of the law are we authorized to treat the instrument as a recognizance. A similar question to this was presented to this court in the case of Maxey v. State, 41 Texas Crim. Rep., 556, where in fact a recognizance was actually entered into but no judgment entry carried forward into the minutes of the court, and this court held it was without jurisdiction to entertain the appeal. In that case the court said:

"The Assistant Attorney General has filed a motion to dismiss the

appeal because there is no recognizance in the record, nor a certificate that appellant is confined in jail. In reply to this, appellant has filed an affidavit of the county judge to the effect that a recognizance was actually taken in open court. This is not sufficient. The recognizance should have been entered of record in the final minutes of the court. A recognizance is an undertaking entered into before a court of record in session by a defendant in a criminal action and his sureties, by which they bind themselves, etc. The requisites thereof are prescribed by our statutes. Arts. 303, 308, 886-888, C. C. P. From an inspection of these articles it is evident that, whatever the court may have done in the way of taking recognizance, it is not perfected until this recognizance is entered of record in the final minutes of the case. 20 Am. & Eng. Ency. of Law, 1 ed., 471. In Quarles v. State, 37 Texas Crim. Rep., 362, it was held that the entry of this recognizance could not be made nunc pro tunc so as to give this court jurisdiction. In Thompson v. State, 35 Texas Crim. Rep., 505, it was held it was the duty of appellant to see that this recognizance was entered of record before the adjournment of the court, and that such recognizance could not afterwards be amended. And see Dement v. State, 39 Texas Crim. Rep., 271. We accordingly hold that, in order to give this court jurisdiction it is necessary not only that the recognizance be taken, but that such recognizance be entered of record during the term at which the appeal was taken."

If in fact appellant's counsel did enter into a recognizance, as he contends, and merely reduced it to writing, and had it signed at the request of the trial judge, yet he had another duty to perform—to see that it was entered of record in the minutes of the court. Thompson v. State, 35 Texas Crim. Rep., 505.

As the instrument copied in the record shows on its face to be an appeal bond and is so denominated in the record, was filed as such in the trial court and never entered of record in the minutes of the court, we are not authorized to treat it as a recognizance. Under such circumstances this court being without jurisdiction, the motion of the Assistant Attorney General must be sustained.

The appeal is dismissed.

*Dismissed.*

ON REHEARING.

December 20, 1916.

HARPER, JUDGE.—Appellant has filed a motion for rehearing, and he earnestly insists that the paper herein filed should be construed to be a recognizance and not an appeal bond, he alleging that he and his sureties went into open court and offered to enter into a recognizance, and that it was at the suggestion of the trial judge that it was written out and signed. He files some affidavits in support of this contention. The State has filed a reply, supporting its contention also by affidavits. None of the affidavits do we deem necessary to recite other than that

of Hon. W. S. Anderson, judge of the Thirty-seventh District Court, before whom the case was tried. The affidavit of Judge Anderson is as follows:

"I, W. S. Anderson, judge of the District Court of Bexar County, Thirty-seventh Judicial District of Texas, on this the 21st day of November, A. D. 1916, being first duly sworn, on oath deposes and say as follows:

"That I have read the affidavits attached to the application for rehearing filed by appellant in cause No. 4185, E. L. Bennett v. The State of Texas, now pending in the honorable Court of Criminal Appeals, at Austin, Texas, said affidavits being as follows:

"The affidavit of E. L. Bennett, appellant, shown on pages 4 and 5 of said motion for rehearing, affidavit of Fred Mayer, shown on pages 6 and 7 of said motion for rehearing, affidavit of Sol Frank, shown on pages 8 and 9 of said motion, affidavit of J. C. Bennett, shown on pages 10 and 11 of said motion, affidavit of J. G. Bennett, shown on pages 12 and 13 of said motion, affidavit of R. H. Ward, shown on pages 14 and 15 of said motion, affidavit of C. A. Keller, shown on page 16 of said motion.

"And I here and now state and swear, that many material facts set forth in each of said affidavits are untrue and do not correctly show the facts that transpired in the Thirty-seventh Judicial District Court before me as judge therein, on the 22nd day of April, A. D. 1916, when the defendant in the court below, appellant in this court, E. L. Bennett, attempted to perfect his appeal therein.

"I have formerly made an affidavit which I considered sufficiently intelligible and sufficient detailed to show the actual happenings upon said occasion, which said affidavit has been filed as a portion of the supplemental brief of the State of Texas in this case and in this court, and same is now at Austin, and not before me, but, . . . in view of the affidavits of E. L. Bennett et al., above referred to, and as supplementary of my former affidavit, I make the following affidavit, in order that this court may know what occurred, and all that occurred.

"It is true that appellant, E. L. Bennett, Sol Frank and other persons came into the courtroom of the Thirty-seventh District Court on the 22nd day of April, A. D. 1916, about noon. For what purpose they came there I do not know, except as I may judge said purpose from the acts that they afterwards performed. It is stated in the foregoing affidavit of E. L. Bennett et al., that Fred Mayer, Sol Frank, J. C. Bennett and J. G. Bennett were examined by the court as to their qualifications as sureties, and that the court announced that he would approve them as sureties, and that they, together with E. L. Bennett, in the presence of the court each and all entered into an acknowledgment with said E. L. Bennett as principal, and with the said other parties as sureties for E. L. Bennett, on his appeal to the Criminal Court at Austin.

"This statement is not the truth. I never examined any of said persons as to their qualifications as sureties, and none of said parties ever before me as judge of the Thirty-seventh District Court acknowledged themselves bound to the State of Texas in any sum, nor entered into an acknowledgment of themselves as principal or sureties.

"Said affidavits further state, 'that after the court had approved said sureties and after the acknowledgment as aforesaid, at the request of the judge of the said court, the form of the said acknowledgment and recognizance was written out on the typewriter at the dictation of R. H. Ward, one of the attorneys for appellant, and we (E. L. Bennett, Fred Mayer, Sol Frank, J. C. Bennett and J. G. Bennett) then and there signed the same as shown by said recognizance, a certified copy of which is marked exhibit A and filed with this motion.'

"This statement is not true, in this, that there never was an examination of the sureties made by the court as shown in said affidavit before the writing of the obligation or instrument shown on page 3, of the motion for rehearing, and there never was any acknowledgment taken or entered into by said principal and sureties before the making of the said written instrument and there never was any requirement or direction made or given by me to the said E. L. Bennett, his attorney or said sureties or any of them as to what they should do in order to perfect their appeal.

"Said affidavit further shows: 'The recognizance referred to "Exhibit A" in this case was not written out and presented to us to sign before it was approved by the court, but the proceedings were had as above stated, and the paper we signed was a recital of what had occurred before in the presence of the court.'

"This statement is not true for the reason that there never was any recognizance entered into, and, therefore, there never was any recognizance approved by the court, before or after the execution of the written instrument set out on page 3 of the motion for rehearing, and this statement is further untrue because there never were any proceedings had as therein stated, and the papers signed by E. L. Bennett and sureties was not a recitation of what had theretofore occurred, and in the presence of the court, because up to the time that said instrument was presented to the court nothing had occurred before or in the presence of the court.

"What actually occurred in reference to this matter was this:

"On the 22nd day of April, A. D. 1916, in the morning of the said day, between 9:30 a. m. and 12 m., during the term of the Thirty-seventh District Court of Bexar County, Texas, at which E. L. Bennett, appellant herein, and who was then defendant, in said case pending in the Thirty-seventh District Court, at which term of said court appellant was tried for murder and convicted of the offense of manslaughter, and his punishment assessed at three years in the penitentiary of the State of Texas, defendant's motion for a new trial came on to be heard before the court, and the court having heard said motion and the argu-

ments of counsel thereon, pro and con, said motion was by the court overruled, and the defendant then and there gave notice of appeal to the honorable Court of Criminal Appeals in the State of Texas, sitting at Austin, and thereupon counsel for the defendant asked the court what amount of security on appeal would be required, and the court informed him that there would be required security in the sum of $3000.

"And thereafter, at, towit: about the hour of noon of the same day, there came into the Thirty-seventh District Court room, Sol Frank and other persons, and thereupon said persons and defendant sat down at a table in the courtroom, off to one side, about ten or fifteen feet from the rostrum, and the attorney for defendant came up to said rostrum and asked the court if any of the officers of the court had any blank bonds or blanks for the making of bonds on appeal, and the court replied 'that he didn't know, but that there were several cases that had been appealed from Bexar County by other attorneys and that he presumed that they had prepared proper papers on appeal and that said papers would be found, he presumed, in the district clerk's office.'

"Thereupon the said attorney left the courtroom and by and by returned with a paper which he said he had obtained from the sheriff, and stated to the court that said paper was not in proper form and that he would have to prepare a proper paper. And thereupon said attorney again left the courtroom and stayed away for a considerable length of time. He then came back into the courtroom with a typewritten paper, sat down at the table with the defendant, E. L. Bennett, Sol Frank, and other persons, and after a few minutes he got up and came to the court's rostrum and handed the court the paper set out on page 3 of appellant's motion for rehearing, which paper at that time, however, did not have on it any approval by me, W. S. Anderson, as judge of the Thirty-seventh Judicial District Court of Bexar County, or any other approval by me, and it did have on it at that time the approval of John W. Tobin, sheriff of Bexar County, by J. W. Galbreath, deputy, and also had on it the following names in the order given, towit: E. L. Bennett, Fred Mayer, Sol Frank, J. C. Bennett, and J. G. Bennett. Whereupon, I looked at said paper and seeing the name of Sol Frank thereon, and knowing of my own knowledge that Sol Frank was worth many times three thousand dollars, I wrote upon said instrument by filling in blank in paper prepared therefor 'Approved, April 22nd, 1916. W. S. Anderson, Judge of the 37th Judicial District Court, Bexar County, Texas,' and handed the same back to said attorney.

"What was done with the same after that time I do not know.

"I further expressly state that the transaction that took place upon this occasion occurred just as I have stated above, and that it did not occur as stated in the affidavits herein mentioned, made by E. L. Bennett et al., and attached to his said motion for rehearing, and I further state that nothing was done upon said occasion except as herein stated.

"That I never examined any of the sureties, and was never requested

to do so, that I never caused said sureties to stand up before me and become recognized, and I never read to them or caused them to state, or heard them state, that they were recognized, nor was I ever requested to do so. And that I never directed the entry in the final minutes of any recognizance in this case, because *there was no recognizance* to be entered, and I never signed said final minutes showing any recognizance, and the minutes of this term, when signed by me, had no recognizance in them, and there is no such entry in them now.

"That I never suggested or directed said attorney, except to state to him how I had heretofore acted in such matters, how to perfect his appeal and never interfered with him in any manner, but that I did all and everything that the said attorney asked me to do, and had he asked me to do anything else that he considered necessary or advisable to protect the rights of his client, that I would have done it.

<div style="text-align:center">"W. S. Anderson,<br>"Judge of the 37th District of Bexar County, Texas.</div>

"Sworn and subscribed to before me this the 21st day of November, A. D. 1916.

<div style="text-align:center">"Geo. B. Mauermann,<br>"Notary Public in and for Bexar County."</div>

It is further shown by the affidavits that this paper was not presented to the clerk, but to the sheriff of Bexar County, Texas, and filed in his office instead of the office of the district clerk. Without going further into the merits, it is readily seen that this court is not authorized to treat the instrument as a recognizance, and entertain jurisdiction of this appeal, but it is simply an appeal bond, and being entered into in term time, it was unauthorized by law.

Appellant has filed a motion that he be now allowed to amend the bond by entering into and filing a new recognizance. This question was before this court in the case of Johnson v. State, 65 Texas Crim. Rep., 416, 143 S. W. Rep., 1165, and it was held:

"On a former day of this term the appeal herein was dismissed for *want* of recognizance. There was then in the record what purported to be an appeal bond, signed by appellant and two sureties. It is not a recognizance, and for that reason the appeal was dismissed. Appellant under takes to comply with an Act of the Twenty-ninth Legislature (Acts 29th Leg., chap. 115), which provides that when an appeal has been or shall be taken from the judgment of any court of this State by filing a bond or entering into a recognizance, within the time prescribed by law in such case, and it shall be determined by the court to which the appeal is taken, that such bond or recognizance is defective in form or in substance, such appellate court may allow appellant to amend such bond or recognizance by filing a new obligation on such terms as the court may prescribe. . . .

"Appellant now filed an instrument which is in the form of a recognizance since the dismissal of this appeal. . . . This is not a legal

instrument, it is not such instrument as is authorized to be executed. Had appellant entered into his recognizance during term time, *and it was legally deficient,* he could have filed a new one *in lieu of the defective recognizance;* but the statute quoted above (Acts 29th Legislature) does not authorize the execution of a recognizance . . . *unless it is to supply a defective one entered into during term time."* To the same effect is the case of Knowlton v. State, 75 Texas Crim. Rep., 8, 169 S. W. Rep., 674, and cases cited.

Again this instrument was not entered in the minutes during the term of court at which appellant was tried, and under the authorities cited in the original opinion this would be fatal.

The motion for rehearing is overruled.

*Overruled.*

MORROW, Judge.—Charged with the murder of E. G. Millikan, the appellant was convicted of manslaughter, the jury assessing his punishment at confinement in the penitentiary for a term of three years.

Appellant's trial began April 10, 1916, and verdict was returned April 19, 1916. On April 22, 1916, appellant's motion for new trial was overruled, and the judgment was entered and sentence pronounced, which, according to the minutes of the court, condemned him "to be confined and imprisoned for the period of three years in accordance with the provisions of law governing the penitentiaries of this State." Appellant excepted to the judgment and gave notice of appeal to this court, which was duly entered of record in the minutes of the District Court on the 22nd day of April, 1916. On the first day of November, 1916, this court dismissed appellant's appeal on the ground that it had no jurisdiction because he had failed to enter into a recognizance as required by law. The term of court at which appellant was convicted finally adjourned on the 29th day of April, 1916. On the 28th of December, 1916, at a subsequent term of the same court in which he was convicted, appellant filed a motion seeking to correct the judgment so as to give him the benefit of the indeterminate sentence law. Responding to this motion, the State filed a reply affirming that the judgment and sentence were valid; and in the alternative the State asserted that the appellant had been properly sentenced and the judgment properly rendered at the term at which he was convicted, and that the judgment and sentence entered in the minutes at that time were not in accord with the judgment entered, and concluded with the following prayer: "The State further prays and moves the court to here and now enter an order directing the clerk to spread upon the minutes the true judgment and sentence heretofore rendered herein on, towit, the 22nd day of April, 1916, and so enter said judgment and sentence nunc pro tunc." The court, on hearing, found as a fact that the judgment and sentence entered in the minutes of the court on April 22, 1916, did not truly record the judgment rendered and the sentence pronounced. The record of the judgment of the court and sentence of

appellant were, on the 30th day of December, 1916, entered so as to condemn the appellant to confinement in the penitentiary for a term of not less than two nor more than three years, and appellant at the time gave notice of appeal to this court, which was also entered of record at said date.

The State insists that appellant has no right of appeal in this case and that the holding in the case of Mendoza v. State, 172 S. W. Rep., 790, and other cases, wherein it is held that a judgment and sentence in form similar to that originally entered in this case were appealable to and amendable in this court, concludes the matter against appellant.

These authorities do not settle the controversy in this case for the reason that the judgment entered April 22, 1916, is not the judgment upon which the State is now relying. If this court had acquired jurisdiction on the appeal, it would doubtless have regarded it as expressing the true judgment rendered, and on the authority of the cases mentioned above, and that of Robinson v. State, 58 Texas Crim. Rep., 550, and the statutes therein cited, and of Ex parte Beeler, 41 Texas Crim. Rep., 240, 53 S. W. Rep., 857, have reformed the judgment, if it found no error requiring its reversal. The State proposes to confine appellant in the penitentiary by virtue of the judgment entered December 30, 1916, and for that reason there is presented a question different from that which was before the court in the cases above mentioned. According to the entry in the court's minutes of December 30, 1916, the judgment *rendered* on the 22nd of April, 1916, was not *entered* of record. It is true that at that time the deputy clerk wrote upon the minutes what purported to be the judgment of the court, but the court, on December 30, 1916, judicially determined that the judgment so *entered did not speak the truth,* and to the end that the proper judgment might be *entered* of record, he directed the entry of the true judgment of the court at that time. It was the court's duty to *enter* in the *minutes* of the court a *true* record of the judgment *rendered.* (2 Vernon's Crim. Stat., art. 853.) Failing to make such record at that time, article 2015, Vernon's Civil Statutes, gave the court authority to amend the record according to the truth. This authority existed by the inherent power to so correct its minutes at a subsequent term. Burnet v. State, 14 Texas, 455; Rhodes v. State, 29 Texas, 188; Ximmines v. Ximmines, 43 Texas, 458; Coleman v. Zapp, 105 Texas, 491; Michie's Civil Digest, vol. 11, p. 106; and cases cited in Cyc., vol. 11, p. 764; authorities cited in note, 4 Am. St. Rep., 820; Jester v. Graves, 159 Kentucky, 244, 38 Am. & Eng. Ann. Cas., p. 678, and note, p. 681, citing numerous cases from various jurisdictions. It follows that the action taken by the trial court on December 30, 1916, was within its jurisdiction.

This last entry expressing the final judgment of the court, is appellant deprived of his right to appeal therefrom by reason of the fact that he failed to perfect his appeal from the entry made at the previous term?

A very similar question was before the Supreme Court of this State in the case of Palmo v. Slayden Co., 100 Texas, 13. In that case Palmo was, on November 13, 1903, awarded a verdict in the District Court of McLennan County for nine thousand dollars and over. The trial judge noted the fact that the verdict had been rendered upon his docket, but no judgment was written on the minutes. On October 24th, at a subsequent term of the court, Palmo sought to have judgment entered nunc pro tunc for the amount awarded him by the jury. No statement of facts nor bills of exception were filed by the party cast in the judgment until after the judgment nunc pro tunc was entered. The question was thus presented whether or not the entry of the judgment nunc pro tunc about a year after the judgment had been rendered was the end of the trial, and the date from which the time would be counted within which statement of facts and bills of exceptions should be filed as the basis of appeal. The Supreme Court held that the statement of facts and bills of exception filed within the statutory time after the entry of the judgment nunc pro tunc were filed within time and could be used as a basis for review of the action of the court upon the trial as originally had, citing Hill v. State, 41 Texas, 253; Sabine & E. T. Ry. Co. v. Joachimi, 58 Texas, 452; Jenks v. State, 39 Ind., 1. The Supreme Court said: "The construction which the foregoing cases have placed upon the terms of statutes similar to that under consideration, we think, fully justifies. the conclusion we have reached, that the *entry of judgment nunc pro tunc was a part of the trial of the case,* and that after that judgment was entered, the parties had a right to have a statement of facts made up and filed upon which to prosecute their appeal."

In the case of Mapes v. State, 13 Texas Crim. App., 85, it is held that the entry of a judgment nunc pro tunc was so essentially "a part of the trial" as to vitiate the judgment nunc pro tunc entered in the defendant's absence.

From the opinion in Scott v. State, 26 Texas, 116, we take the following: "We are of opinion that the motion to dismiss the appeal ought not to prevail. It has been the constant practice of this court to entertain appeals in criminal as well as in civil cases, where, as in this case, the court having omitted to cause the entry of the judgment to be made at the proper term, had caused it to be entered *nunc pro tunc* at a subsequent term. Otherwise, the right of appeal might be defeated by the failure of the court to correct at the term a clerical omission."

In the case of Railway Co. v. Whorley, 74 Ala., 264, the question of the right to appeal from a judgment nunc pro tunc, which judgment corrected omission in the original judgment entry, was passed upon in the affirmative, the court holding that the entry of the corrected judgment was the end of the trial.

In a California case, Ward v. Dunn, Judge, 68 Pac. Rep., 105, the question of the right of a party convicted of felony to appeal from a

judgment nunc pro tunc and have the entire case reviewed was affirmed. In that case a judgment had been entered at a previous term of court, but it was incorrectly entered. Subsequently a judgment nunc pro tunc was entered correcting the errors in the former judgment. The appeal was prosecuted from the order entering the last mentioned judgment, and the right of the appellant to this appeal was sustained.

It is urged by the State that an appeal from a judgment entered nunc pro tunc is not maintainable except in cases where it is entered in lieu of a void judgment, or in cases where no judgment is entered at all. Article 859, C. C. P., provides that where there is a failure to enter judgment or pronounce sentence upon conviction during the term, judgment and sentence may be pronounced at any succeeding term. We think there is no doubt of the court's power to enter a judgment nunc pro tunc independent of this statute. However, it is difficult to understand why the facts of this case should not bring it under the terms of the statute last mentioned. In the case of Coleman v. Zapp, 105 Texas, 491, the Supreme Court sustained the entry of a judgment nunc pro tunc after six years in a case where there had been an omission in the original judgment of an item of $1800; and, as we understand the case of Rios v. State, 79 Texas Crim. Rep., 89, 183 S. W. Rep., 151, it construes article 859 to apply to a case where there is a judgment written on the minutes which does not in fact express the judgment rendered. In the Rios case the judgment originally rendered inserted the name of Clarence Lenier instead of Jeorge Rios, the defendant on trial. After a dismissal of the appeal, the judgment was amended by rewriting in the minutes of the court a correct entry. This court held that, under article 859, this was proper procedure.

The State's counsel insists that the case of Offield v. State, 61 Texas Crim. Rep., 340, is decisive of this case and that because thereof it should be held that his right of appeal did not exist. The Offield cases, 61 Texas Crim. Rep., 430, and id., 585, construed articles 1882-1883 and followed numerous prior decisions of this court in holding that, under the peculiar language of these articles of the statutes it was necessary to enter notice of appeal at the time the conviction was had and that it could not be entered afterwards. Nothing was involved in the cases except the bare question, which had previously been repeatedly decided, that the notice of appeal, although given at the term when the verdict was rendered, could not, owing to the peculiar verbiage of the statute relating to notice of appeal be subsequently entered.

The case of Smith v. State, 1 Texas Crim. App., 408, holding that an appeal will lie from a judgment entered nunc pro tunc, was decided long prior to the time that the Offield cases were decided. The last named case does not question its correctness.

In our judgment, the rule that, where a final judgment nunc pro tunc is entered, it is the conclusion of the trial, from which the defendant may prosecute an appeal, is not modified by the case of Ex parte Strey, 28 S. W. Rep., 811, nor Ex parte Beeler, 41 Texas Crim. Rep., 240,

53 S. W. Rep., 857. If the true judgment rendered by the court had been that indicated by the minutes of April 22nd, the judgment would not have been void but irregular, and on appeal to this court would have been corrected. The Beeler case, supra, recognizes the correctness of the procedure in this case but in no way modifies the right of the trial court when it determined that the first judgment entered did not speak the truth and directed that the judgment be correctly entered and that the entry then made was the record of the final judgment, which ended the trial and from which the appeal could be prosecuted.

There being nothing in the record to show that appellant has not been in custody since the entry of the final judgment, the question of escape does not arise. In our opinion, the jurisdiction of this court is properly invoked, and it becomes its duty to pass upon the questions presented by the record relative to the trial of the case.

Appellant shot and killed the deceased, Millikan, in San Antonio, Texas, on August 21, 1915. The deceased and appellant had been acquaintances for some years before the homicide, and for two or three years prior to the fall of 1913 had been intimate friends and more or less associated in business transactions, and through these business transactions the deceased had become indebted to the appellant for a sum of money amounting to several thousand dollars. During the spring of the year 1913 the appellant began to entertain suspicions that the relations between deceased and appellant's wife were too intimate, and forbade his wife to go to Sutherland Springs in company with the deceased, giving as a reason therefor that it would injure her reputation, and appellant testified that he was in a hospital at the time of this conversation, having undergone an operation, and his wife insisted that she would go with the deceased, and that while he was still in the hospital the deceased came to him and said: "I understand you are talking about my reputation." The defendant said: "I have said certain things. Don't you ever come to my house again. Don't ever come to see my wife, my mother-in-law and my children. Keep away from my house." To which the deceased replied: "Mr. Bennett, that is a damned insult, and as soon as you can stand up, we will fight it out. When you get up, we will go out in the sticks and shoot it out until one of us is dead." On September 5, 1913, appellant wrote to deceased the following letter: "As you have ignored my oral request to keep away from my home and my wife, I now notify you in writing that I forbid you to visit my home, my wife or any member of my family or to meet them in public or private, or to 'phone them, write them, or have any communication or conversation with them, directly or indirectly. Any disregard of this notice will be at your peril." There was evidence that the deceased was a frequent visitor at the appellant's home, and up to the spring of 1913 these visits occurred both when he was present and during his absence. There was evidence also that the deceased and appellant's wife went to various places of amusement together, went to Sutherland Springs and went in

bathing together, and one witness testified that he saw them in a rooming house together. All of which was brought to appellant's attention before the homicide. In August or September, 1913, appellant's wife sued him for a divorce, and as we understand the record, he filed a cross-bill making counter charges, and that he left his home about this time or shortly after and that the deceased continued to visit his home after appellant's separation from his wife. Appellant claimed that after the separation he had met his wife and the deceased and appellant's adopted daughter on the street and that the daughter had been sick, and appellant stopped to talk to her and that the deceased interfered, and in the course of the conversation said to appellant: "You are going to get hurt"; to which appellant replied: "Who is going to hurt me?" And deceased said: "I am. Pull your damned gun, and we will shoot it out." Appellant said: "I have no gun." Deceased said: "You had better get yourself one. The next time we meet one of us has got to die." Appellant claims that this was the last time he met deceased before the homicide. The evidence showed that after the defendant warned the deceased to keep away from his premises in the spring of 1913, the deceased and appellant and appellant's wife met at appellant's house and in a manner patched up their differences. Judge C. A. Keller, the attorney representing appellant in his divorce proceedings testified that on December 12, 1914, he had communicated to appellant a message that deceased had given him about that time, as follows: "You had better tell your client I am going to see the madam and spend the evening with her." There was evidence that the deceased knew of appellant's suspicions with reference to the conduct of deceased and appellant's wife and that appellant resented it and was endeavoring to procure proof of their illicit intercourse.

The State's eyewitnesses testified that at the time of the homicide the deceased was standing on the sidewalk near a post reading a newspaper; that he was leaning up against the post and that while the deceased was reading the newspaper the appellant shot him three times.

Appellant's version of the affair was as follows: "The next morning, the 21st, I didn't sleep very much. I was sick most all night and I got up. I slept the latter part of the night. I must have got up about 6 o'clock, maybe 6:15, along in there, got up, shaved and dressed and went downstairs, my intention being to take a street car or jitney across over to the S. P. depot, where my customer was, and sell him, but when I got downstairs and paid my bill and stepped out on the street there was no street car there and no jitney in sight. I hadn't had breakfast, so I stood in the doorway a few minutes, so I thought I will go over to the Brown News Company and get breakfast. The Brown News Company is situated in the I. & G. N. depot; they have a nice lunch counter there, and as I stepped off the sidewalk going over cater-cornered towards the I. & G. N. depot—I mean stepped off the door step—I had taken probably two or three steps when a man came walking around the corner, had a newspaper in his hand, opened out; he

went around the corner and looked up, and we saw each other simultaneously, and it was Mr. Millikan. He immediately made a quick move with his paper and jerked off his glasses, and the thought passed through my mind is now, it all came in a second, one of us had to die the next time we met, and I thought, like that, to me, this is the shooting, and I quickly pulled the revolver from my coat pocket and shot. I just shot once then, and apparently it missed him; at least it didn't have any effect on him, and he made a very quick jump over to the edge of the sidewalk and got behind a couple of steel or iron posts that were there. Then the thought occurred to me, now he is going to get me from ambush, so I stepped forward again to get a little bit to one side, and shot twice more, very close together. I could see the effect of this immediately; he sort of sagged down; he grabbed the post with both hands and straightened himself, and I realized then that if he had a revolver in his hand he must have dropped it in the gutter; he jumped across the gutter and jumped back. It occurred to me then I was beyond danger; I saw he was not going to shoot me because he had been hit. I lowered my gun and stood looking at him. He looked me square in the eye and then he turned and ran."

On cross-examination of the appellant by the State, when asked for his reasons for his suspicions with reference to the relations between his wife and the deceased, he testified as follows: "And I got hold of some of her own writing in which she herself said she had been out riding at night. That was minutes she had made; I suppose you would call it a diary. I took those diaries when I left there. They are in the hands of my attorneys. I found a great many different things in those diaries; I found where he always made it a point to call at my house when I was absent. I can't remember the days and dates on which those visits are recorded from memory; it would be impossible; there were hundreds of them." He also said that there were different markings which he considered to mean certain things; that they were private marks in her book. "They never appeared except when she went out riding with Mr. Millikan and he was at the house, and they always appeared when he was there, and I considered them to be records of their illicit intercourse, I believed them to be, and I still believe them to be. I found those records nearly every time Millikan was at the house alone. Those markings were asterisks. Sometimes that kind of a marking and sometimes that kind of a marking."

After the appellant had given the above testimony on cross-examination, he introduced in evidence forty odd entries from his wife's diary. These entries were between the dates of March 29, 1910, and December 3, 1911, inclusive. These entries were in books kept by appellant's wife, and each entry was separate and bore a separate date. There were in the same book and other books separate entries on different dates covering practically every day between February, 1910, and April 13, 1916, which was after the trial of this case began. After the appellant had introduced in evidence the forty odd items mentioned, the State

introduced the several books containing all of the other entries therein, including entries up to April 13, 1916.

Among the bills presenting objections to this evidence is bill No. 5, from which it appears that the State introduced and read to the jury an entry from the diary of April 2, 1911, in which, among other things, appears the following: "Ed has abused me outrageously and should any trouble arise he would try to win sympathy and I must have some evidence. He began when I was in a family way with Leo. He insulted me in the most terrible fashion. He has been overbearing and cross. My life has been hell sometimes. Today he was so mad that he reminded me that he pays for my grub and the house I live in."

Another bill, No. 7, shows the State introduced from the diary another, dated April 10, 1916, containing the following: "Well, today the trial began. I suppose Ed will be turned loose. All murderers are here unless they are negroes or Mexicans." And on the 12th of April an entry containing the following: "This has been a stormy old day for me. I am all unstrung and half sick but quite hopeful. I am so anxious about the case. The outlook is pretty good, but I am afraid Ed will go free just because I have heard of so many murderers going free." And on the 13th of April another entry, from which the following is taken: "I am still very hopeful, but I am also prepared for the worst; that is, his release, but I can not believe the jury will ever acquit him if there has been no crooked work done." The qualification to this bill shows that these entries in bill No. 7 were not read to the jury but that the books containing them were in evidence and were passed among the jury.

These bills were further qualified with the following statement:

"The defendant, Bennett, as a witness in his own behalf, read each of these (forty-two) entries to the jury.

"In so reading them to the jury he called particular attention to certain marks appearing therein opposite certain of the entries read. These marks he designated as 'a cross,' 'an asterisk,' 'a circle,' etc. He stated that these marks did not appear except opposite entries where Millikan, the deceased, was mentioned by name, and that they always so appeared when Millikan's name was mentioned.

"The defendant then stated that on the presence in the diary of these marks in conjunction with the mention therein of Millikan's name, he drew the conclusion that said marks indicated, and were a record kept by Mrs. Bennett hereof, there on the dates when they appeared Millikan had had sexual intercourse with Mrs. Bennett.

"This was establishing facts relied on by the defendant to justify his act in killing Millikan, by the indirect testimony of the wife through the memoranda and symbols made by her.

"The State then proposed, by the same means, that is, by introducing other entries from the same diaries, to show (1) that the marks described by defendant, Bennett, did not always appear when Millikan's name was mentioned; (2) that they appeared when his name was not

mentioned; (3) that his name was mentioned when they did not appear; (4) that they appeared when the names of other men were mentioned, with whom the defendant did not claim that Mrs. Bennett was criminally intimate; (5) that they appeared when the names of women were mentioned; (6) that they appeared when the name of Bennett himself was mentioned; (7) that some of the entries showed on their face that Millikan's visits on the date of the entry was for a definite purpose other than that of visiting Mrs. Bennett; (8) that the marks referred to appeared in the diaries on dates subsequent to the death of Millikan; and that, therefore, these marks could not be a record showing Mrs. Bennett's illicit relations with Millikan.

"And the court allowed the State to do this (1) because the entries in the diary, introduced by the State were parts of the same written instrument, other parts of which had theretofore been introduced in evidence by the defendant; (2) because the proof made by the introduction of these entries introduced by the State was in the nature of legitimate cross-examination of the wife on matters already brought out by the defendant." ·

Another bill touching these entries in the diary contains about 250 pages in the record, including many hundreds of these entries, a large number of them made after the homicide. This bill is qualified with the statement that the entries were not read "to the jury nor by the jury" but that the books were passed among them. On account of this qualification, we will not discuss this bill further than to say that if the matter was properly presented we would hold that none of the entries in the diary of dates subsequent to the homicide were admissible. The only theory upon which any of the entries in the diary was admissible was upon the issue of motive and the state of defendant's mind at the time of the homicide. None of them was available to either side to establish the existence of any fact recited in the diary, but inasmuch as appellant claimed to have drawn certain inferences from marks made in connection with these entries, and it appears that he obtained this information before the date of the homicide, and he having introduced some of these entries, the State was entitled to use such other of the entries as were calculated to throw light upon the question of whether appellant drew or was justified in drawing the conclusions from them that he claimed to have drawn. This right we think the State had by virtue of article 811, C. C. P., which we quote as follows: "When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as, when a letter is read, all other letters on the same subject between the same parties may be given. And when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence," and in consequence of the construction placed upon this article by the decisions of this court in Watts v. State, 75 Texas Crim. Rep., 330, 171

S. W. Rep., 202, and other cases cited in Vernon's Ann. C. C. P., pp. 759 and 761.

In our opinion, this right of the State, however, was limited to such matters as were calculated to throw light upon the issues named, and we are at a loss to understand how the entry of April 2, 1911, set out in bill of exceptions No. 5 serves this purpose. It is not shown that this entry was accompanied by any of the marks described by appellant from which he drew the inferences mentioned, and it appears from the bill that the deceased was not mentioned in this particular entry.

In our opinion, the entries in the diary were not a part of the same writing in the sense that that term is used in the article of the code quoted. Each entry bears a separate date and is complete in itself.

Nothing in the entries introduced by appellant, even if they had been testified to by appellant's wife as a witness in his behalf, would have justified a cross-examination which drew out the matters complained of in bill of exceptions No. 5, which we have quoted above. That they were calculated to bring the appellant into great disfavor with the jury is apparent upon their face. That they were damaging statements coming from a witness who under articles 494-495, C. C. P., were not competent to testify against him. We quote the statutes, as follows: Article 794: "Neither husband nor wife shall, in any case, testify as to communications made by one to the other, while married; nor shall they, after the marriage relation ceases, be made witnesses as to any such communication made while the marriage relation subsisted, except in a case where one or the other is prosecuted for an offense; and a declaration or communication made by the wife to the husband, or by the husband to the wife, goes to extenuate or justify an offense for which either is on trial." Article 795: "The husband and wife may, in all criminal actions, be witnesses for each other; but they shall, in no case, testify against each other, except in a criminal prosecution for an offense committed by one against the other." Privileged conversations between the appellant and his wife are given in the statement, and the whole of it is hearsay of a pronounced character. Hamilton v. State, 36 Texas Crim. Rep., 372: Stiles v. State, 44 Texas Crim. Rep., 143.

The reasoning which justified the introduction by the State of such of the entries in the diary as were calculated to throw light upon the correctness of appellant's inferences does not obtain with reference to those entries which were made subsequently to the homicide. These did not operate upon appellant's mind at the time he killed deceased. They were inhibited by articles 794-795, C. C. P., and by the rule against hearsay testimony.

As stated above, we omit any discussion of the many entries which are referred to in bill of exceptions No. 10, because of the qualification to that bill mentioned, and they form no basis for the conclusion reached with reference to the disposition of this case.

Having reference to those only which are mentioned in bill No. 7

and quoted above, it appears that the jury was informed that the appellant's wife was watching the progress of the trial; that she hoped for his conviction; that she feared his acquittal; that she regarded him as a murderer. This information was given to the jury, not upon the cross-examination of any witness put upon the stand by the appellant, nor was it gleaned from a diary made by his wife containing entries which came to his knowledge before the homicide, but was from written unsworn statements made by a witness who, under the laws of this State, was prohibited from giving testimony of the appellant's guilt. Its admissibility in our judgment can be sustained upon no rule of evidence. It is true that the record indicates that appellant introduced one of the entries in the diary which are referred to in bill of exceptions No. 10: If the State had opposed the introduction of this entry upon the ground that it was hearsay, the court should have sustained the objection, but its introduction does not cure or justify the error committed by the court in admitting in evidence the other entries discussed. Nothing in it if it had been given in testimony by appellant's wife would have made the entries set out in bill of exceptions No. 7 and quoted above admissible upon cross-examination.

From what we have said it is apparent that in our opinion the court committed error in permitting the use of the diary in the respects mentioned because it was not only hearsay but prohibited by the statutes which declare that the testimony of the wife can not be used to criminate her husband and that confidential communications between husband and wife are privileged. Woodall v. State, 58 Texas Crim. Rep., 513; Brock v. State, 44 Texas Crim. Rep., 335; Eads v. State, 131 S. W. Rep., 145; McDonald v. State, 73 Texas Crim. Rep., 125; Pace v. State, 61 Texas Crim. Rep., 436; Miller v. State, 65 Texas Crim. Rep., 302; Davis v. State, 45 Texas Crim. Rep., 292; Downing v. State, 61 Texas Crim. Rep., 519; Vickers v. State, 69 Texas Crim. Rep., 628, 154 S. W. Rep., 578.

The court submitted the issue of self-defense and threats and charged the substance of the statute on the presumption arising from the use of a deadly weapon by the deceased. These charges were as follows:

"A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"If, from the evidence, you believe the defendant killed the said E. G. Millikan, but further believe that at the time of so doing the deceased had made an attack on him, which, from the manner and character of it and the relative strength of the parties and the defendant's knowledge of the character and disposition of the deceased, caused him to have a reasonable expectation or fear of death or serious bodily

injury and that acting under such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him; and if the deceased was armed at the time he was killed and was making such 'attack on defendant, and if the weapon used by him and the manner of its use were such as were reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder or to inflict serious bodily injury upon the defendant."

"If you believe from the evidence that deceased, E. G. Millikan, had threatened to take the life of defendant, or had threatened to do him some serious bodily injury, and you further believe from the evidence that at the time of the homicide deceased, E. G. Millikan, did some act which caused defendant to believe or apprehend that his life was in danger, or his person was in danger of serious bodily injury, viewed from defendant's standpoint alone at the time of the shooting, under such circumstances defendant would have the right to shoot and kill deceased, and would be guilty of no offense, and your verdict should be 'not guilty.'"

There was no evidence that the deceased had a deadly weapon in his possession at the time he was killed. The evidence negatives this position. Appellant's defense was purely self-defense upon threats and apparent danger. The appellant requested the court to give the following special charge: "If you believe from the evidence that the defendant shot and killed the deceased, E. G. Millikan, yet if you believe that at the time the defendant fired the fatal shots it reasonably appeared to him from the circumstances of the case, viewed from his standpoint, that the deceased was then about to shoot him with a pistol, he was justified in killing the deceased, although in fact you may believe, from the evidence, that the defendant was in no danger at the time of being shot by the deceased, and though you may further believe, from the evidence, that the deceased, at the time of the killing was unarmed, and if you so believe you should acquit the defendant, and so say by your verdict."

The charge on self-defense did not sufficiently present to the jury the issue of apparent danger; and in view of this fact and the fact that the court instructed the jury on the presumption arising from the use of a deadly weapon by the deceased in the absence of any testimony showing that he had a weapon, we think rendered it improper for the court to refuse to read to the jury the special charge above quoted. Such special charge, in our opinion, under the circumstances, should have been given in order to properly safeguard appellant's rights, and its refusal was error.

The assignments which have not been discussed have been considered. They present no reversible error.

For the error in refusing the special charge above mentioned and the admission of the testimony complained of in bills of exceptions Nos. 5

and 7, it is ordered that the judgment of the lower court be reversed
and the cause remanded.

<p align="right">*Reversed and remanded.*</p>

<p align="center">ON REHEARING.</p>

<p align="center">April 18, 1917.</p>

DAVIDSON, PRESIDING JUDGE.—Reviewing this case in the light of
the State's motion for rehearing, I am fully persuaded that the original
opinion written by Judge Morrow is correct. I do not care to discuss
the matters in regard to the introduction of parts of the diary of ap-
pellant's wife, held to be reversible in the original opinion. The State
ought not to be heard to insist upon the right to use those entries
expressing her opinion of her husband's guilt, and her wish or desire
for his conviction. It certainly can not be the law that she could give
her opinion of his guilt, much less her earnest desire for his conviction,
as was shown by such entries. Those entries criticising courts and
animadverting upon the juries of Bexar County for what she thought
to be their derelictions in the acquittal of parties accused of crime and
expressing her anxiety and hope for the conviction of her husband and
doubt of his conviction on account of those matters, were not admis-
sible. These could not be evidence against appellant from any witness
much less from his wife. She could not have testified to these matters
had she been placed upon the stand. That this was a grave and serious
error will not admit of doubt. She may have believed him guilty and
desired his punishment, and may have felt outraged at acquittals of
accused persons in Bexar County, but her opinions and feelings could
not be shown in evidence. I wish to make these few observations in
agreeing to the reversal and in overruling the motion for rehearing.

I wish to make a few observations with reference to the charges of
the court and the refusal of special instructions requested by appellant.
These charges are sufficiently quoted by Judge Morrow in his original
opinion. It will be observed in reading those charges that the court
gave first a general abstract definition of self-defense which made no
application to the facts. It will be noticed further that applying the
law to the case he limited the consideration of the jury to an actual
attack, and one "which, from the manner and character of it and the
relative strength of the parties and the defendant's knowledge of the
character and disposition of the deceased, caused him to have a reason-
able expectation or fear of death or serious bodily injury and that act-
ing under such reasonable expectation or fear, the defendant killed the
deceased, then you should acquit him," etc. The court further in-
structed the jury that if in making such attack the weapon used by
deceased and the manner of its use was such as was reasonably calcu-
lated to produce death or serious bodily harm, then the law presumes
the deceased intended to murder or to inflict serious bodily injury. It

will be discovered from this charge that the jury was limited to an actual attack; second, to the relative strength of the parties; and, third, that if the weapon used by him was such as was reasonably calculated to produce death or serious bodily harm, then the law presumes that he intended to kill. This charge does not present correctly the rule of apparent danger, therefore the charges requested by appellant presenting that matter should have been given. The evidence does not disclose an actual attack on appellant. Self-defense was predicated alone upon apparent danger and also as viewed in the light of threats. There is no evidence that deceased had a pistol. If he had and exhibited it, we would have presented a different question. Appellant relied upon threats to take his life and a demonstration as he thought to draw a weapon.

The question of relative strength of the parties did not enter into the case, and there is no possible phase of the evidence which would authorize the court to submit this issue; they were not in physical encounter. The question of the relative strength of the parties may sometimes become an important matter but not under the circumstances found in this record. Upon another trial the jury should be instructed upon apparent danger, and the question of relative strength of the parties omitted as well as that clause of the charge which instructed the jury as to the effect of the use of a deadly weapon. Sometimes it may be a close question as to whether or not a charge should be given with reference to the use of a deadly weapon, but under the facts of this case the charge was not justified, and it tended to turn the consideration of the jury upon an issue not raised. Had deceased drawn and attempted to shoot a pistol the question of real danger would have been raised and the charge on actual danger called for and justified. But such issue was not in the case.

The court gave a rather restrictive and limited charge on threats, which, in the judgment of the writer, should be amplified upon another trial. This charge, it will be noticed, confined appellant's rights to the belief of the jury as a predicate for their finding. This was error. It is the belief of the accused which furnishes the criterion. This applies as well to the question of the acts of the deceased. It is the belief of the accused that his life was in danger or his body of serious injury, viewed from his standpoint, which is the basis of our law under such circumstances. The acts and demonstrations, in view of threats by deceased, are viewed from the defendant's standpoint at the time he acted, and if the defendant believed those things he was entitled to act the same as if they were true. What the jury may believe in the light of the testimony showing that deceased had no pistol is not the criterion, nor is their belief in the light of subsequent developments the criterion. It is the belief of the defendant who is being tried for his life and liberty under all the circumstances as they presented themselves to his mind at the time he acted that should govern the jury in determining guilt. The jury may

not but the defendant may have believed those things, and it is his belief by which the jury should be governed in rendering their verdict.

There is another question to which I call attention. The court charged self-defense from the standpoint of threats. There should be upon another trial a charge given upon self-defense viewed in the light of apparent danger independent of the question of threats. The writer does not care to enter into a discussion of this question. In reference to the charge on threats being submitted from the defendant's standpoint, the authorities will be found collated in Mr. Branch's Crim. Law, secs. 447 and 482. That self-defense charge should have been independent of and disconnected from threats see Branch's Crim. Law, sec. 482, for collated authorities. As to the question of charging upon apparent and not actual danger, where apparent danger only is in the case, see Branch's Crim. Law, secs. 443 and 444, for cited cases. For self-defense from defendant's standpoint and especially from apparent danger and threats, see Bell v. State, 20 Texas Crim. App., 445, and Spearman v. State, 23 Texas Crim. App., 224.

Briefly I have written these as some of the reasons why I concurred in the reversal of the judgment and so write in overruling the motion for rehearing.

<div align="right"><em>Overruled.</em></div>