No. 2310.

R. F. SPEARMAN v. THE STATE.

1. ASSAULT WITH INTENT TO MURDER—AGGRAVATED ASSAULT—MUTUAL COMBAT.—A homicide committed in mutual combat would not be reduced to manslaughter, under the code of this State, unless it was committed under the influence of sudden passion arising from an adequate cause; and therefore, if death did not ensue, the offense would not be mitigated from assault with intent to murder to aggravated assault. Note the distinction taken in the opinion between manslaughter under the code of this State and manslaughter at common law and in some of the other States.

2. SELF DEFENSE—CHARGE OF THE COURT.—The trial court instructed the jury in effect that, to constitute justification on the ground of self defense. the act must have been done "in fact in self defense, and not merely colorably so." *Held* erroneous, because subversive of the right of self defense resulting from reasonable expectation or fear of death or serious bodily injury, and because it absolved the jury from their duty to view the circumstances from the standpoint of the defendant at the time.

APPEAL from the District Court of Hunt.    Tried below before the Hon. J. A. B. Putman.

The indictment charged that the appellant, on October 13, 1886, made an assault upon W. B. Howard, with intent to kill and murder him.   Appellant was found guilty as charged in the indictment, and his punishment was assessed at two years in the penitentiary.

D. Krebs, for the State, testified that he lived in Kingston, Hunt county, Texas, and knew the defendant.   On November 13, 1886, the witness and W. B. Howard were walking down Church street, in Kingston, talking about a business matter. After passing the hardware store of Mathews & Clemons, a few feet, the witness, who was on Howard's left, heard some one say "hold up," and, looking up, saw the defendant, five or six steps distant, approaching with a pistol in his hand and presented.    Witness and Howard stopped, and the latter said, "You can shoot me; I can't help it," or something of that sort. Witness, thinking the pistol was pointed at him, stepped aside a

step or two. Defendant fired at Howard, who threw his left hand to his side as if he was shot, and with his right hand drew his pistol and fired at the defendant. The parties continued firing at each other, and after defendant had fired his fourth shot at Howard and the latter his third shot at him, he, the defendant, turned and walked back, and Howard went into a shed. They were not more than eight or ten feet apart during the shooting. Howard was struck once, in the right side of the breast, and the ball came out on the same side, three or four inches from where it entered.

Cross examined, the witness stated he and Howard were engaged in a conversation about a business matter, which engrossed his attention until the defendant spoke, and up to that time he was looking down. Consequently he did not see defendant until he spoke. The street was sixty feet wide, and the shooting occurred ten or fifteen feet east of a line between the barber shop and the hardware store. Defendant was northeast of Howard. His course would have intercepted that of the witness and Howard in a few feet. Witness did not notice Howard's position until after the first shot was fired, and did not know where he got his pistol from. He raised his hand from his side with his pistol just as the defendant fired. The witness was not an extraordinary friend and admirer of Howard, although he was so considered by a great many people.

R. L. Brown testified, for the State, that he was standing in front of his store, on the north side of Church street, in Kingston, at the time of the shooting between defendant and Howard. Witness saw Howard leave his office, which was on Main street, about one hundred yards below its intersection with Church street, and start towards his home. He came through witness's store, where he was joined by M. D. Krebs, and they went off east, diagonally across Church street, towards its intersection with Main street. When they reached a point about one hundred feet east from witness, the witness saw defendant in the street in front of the barber shop, going southwest in a direction that would meet Howard and Krebs. He had his pistol in his hand, pointed at Howard. At a point about twelve feet apart, defendant and Howard stopped. Defendant fired. Howard tried, but failed to get his pistol out of his waistband, and defendant fired again. Howard then raised his pistol with both hands and fired at defendant. Defendant fired again and Howard fired again. Defendant then turned and went through the

stores, and Howard went into a shed. Howard had received a flesh wound in the right side.

Cross examined, witness stated that his attention was directed particularly toward Howard and Krebs by the earnestness of their conversation. He knew that Howard did not draw nor attempt to draw his pistol until after defendant fired upon him.

The next two witnesses for the State described the relative positions of the parties when the shots were fired, as did the previous witnesses. Bates declared positively that defendant fired the first shot. Harris testified that defendant had his pistol drawn before Howard drew his, and, he thought, fired first, but the shots were so near together he could not state that fact positively.

The State closed.

Rube Keith was the defendant's first witness. He testified that he was in Patterson's saloon when the first shot was fired in the battle between defendant and Howard, and could not say who fired that shot. He saw the other shots fired, and knew that the interval between the first and second shots was very short. Just before he stepped into the saloon the witness saw defendant standing on the sidewalk in front of the barber shop. Howard and Krebs at that time were in front of Mathews's hardware store, going up the street. A moment before witness stepped into the saloon, he saw Howard put his right hand behind him, and withdraw it empty. Howard was then looking at defendant. The shooting occurred a few seconds afterward.

Frank Hensley testified, for the defense, that he saw the "shooting spree" between defendant and Howard, but did not see the parties meet. Just as defendant started from the barber shop toward Mathew's hardware store, witness stepped into Foster's store. Going out a minute later, witness looked toward the hardware store and saw Howard standing in the street with his pistol pointed at defendant. Defendant then had nothing in his hand. Witness, who was in Howard's range, sprang back into Foster's store, and the first shot was fired.

Henry Kirkpatrick, the next witness for the defense, described his own and the positions of the principals at the time of the shooting, and testified, positively, that Howard was the first to draw a weapon, and fired the first shot before defendant got his pistol out. He testified further that, about two weeks before the shooting, Howard called him into his office and told him to keep his little boy off the streets. Witness asked him why. He re-

plied: "Your little son has been shot once by being on the streets of town during a shooting scrape, and a shooting scrape between me and Spearman is liable at any time." A few days after that the witness told defendant what Howard had said to him.

J. W. Patterson testified, for the defense, that he was behind the counter of his saloon when the shooting took place between Howard and defendant. Looking through his front door, he saw Howard and Krebs going across the street in a southeasterly direction. Witness saw Howard take out his pistol and carry it behind him in his right hand for a short distance. After taking a few steps, holding his pistol behind him, Howard stopped and presented his pistol in a direction nearly towards witness. Witness got down behind the counter and the shooting commenced. He did not see the defendant at any time during the shooting. He was positive that Howard had his pistol out and presented before a single shot was fired. Howard was considered a violent and dangerous man, and reasonably likely to execute a threat.

The defense closed, after introducing a large number of witnesses who testified that Howard's reputation was that of a violent and dangerous man, who might reasonably be expected to execute a threat seriously made, and that defendant was generally regarded as a quiet, peaceable man.

Paul Willis was then called by the State in rebuttal. The substance of his testimony was that he was in Foster's store, talking to Frank Hensley, when the firing occurred, and that he did not and could not see the shooting from where he and Hensley were. It was the witness's recollection that he and Hensley were actually facing each other, talking, when the first shot was fired.

W. W. Cole testified, for the State, in rebuttal, that he stepped into Foster's store a short time before the shooting commenced, and was in there during its progress. He did not meet Frank Hensley going out as he went in, nor did he see Hensley in the store at all, though he may have been on the opposite side of the house.

A number of witnesses introduced by the State, in rebuttal, testified that W. B. Howard had the general reputation of being a quiet, peaceable citizen, but one who would fight when attacked or in defense of his honor and reputation.

The motion for new trial raised the question discussed in the opinion.

*E. W. Turhune*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. In his charge to the jury the learned trial judge, upon the subject of mutual combat, charged as follows: "Where two parties arm themselves and voluntarily engage in a combat with each other, with deadly weapons, knowing that such combat will, or may probably produce the death of either or both of them, then neither of such parties could claim the benefit of the law of self defense, but if they both intended to kill, both may be guilty of assault with intent to murder." And in another paragraph of the charge as follows: "But if the defendant voluntarily engaged in a combat with W. B. Howard, with deadly weapons, knowing that it would or might probably result in the death of W. B. Howard or of himself, or in some serious bodily injury which might probably result in the death of Howard or himself, * * * he could not avail himself of the privilege of self defense, no matter to what extent of danger he may have been reduced in the combat, and no matter which party struck the first blow, or fired or attempted to fire the first shot, and in such case the defendant would be guilty of assault with intent to murder."

The above quoted paragraphs of the charge were excepted to by the defendant, and he submits the proposition that, "where a combat is mutually waged with deadly weapons, on equal terms, where death does not ensue, the offense is aggravated assault," and not assault with intent to murder. In support of this proposition he cites King's case, 4 Texas Court of Appeals, 56; Wilson's case, Id., 644; Sanches' case, 24 California, 17, and Crowley's case, 56 California, 36. We concede that these cases support the proposition stated, and we concede the correctness of the decisions when considered with reference to the rule at common law, and without regard to our statute of manslaughter. But, when viewed with reference to our statute of manslaughter, these decisions, in our opinion, can not be held to be the law of this State, without material qualification. To reduce a homicide from murder to manslaughter, under the law of this State, the homicide must not only be committed under the immediate in-

fluence of sudden passion, but that sudden passion *must arise from an adequate cause,* and this *adequate cause* is defined to be "such as would commonly produce a degree of anger, rage, resentment or terror, in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." (Penal Code, arts. 593–595.) Now, unless this *adequate cause* existed, the homicide would not be reduced to manslaughter, although it may have been the result of sudden passion on the part on the slayer. At common law, *adequate cause* was not required to reduce the homicide to manslaughter, but only that it was committed under the influence of sudden passion, without malice aforethought. Thus, it will be seen, there is a very material difference between manslaughter at common law, and that offense as defined by our code. We think the true doctrine under our statute is that announced by this court in Crist v. The State, 21 Texas Court of Appeals, 361, as follows: "When parties mutually engage in a combat with deadly weapons, under circumstances which would not reduce to manslaughter, if either party is killed, the party killing would be guilty of murder, and the fact that the combat is mutual would not, *ipso facto,* reduce to manslaughter." In other words, a homicide committed in mutual combat would not be reduced to manslaughter unless it was committed under the influence of passion, arising from an adequate cause. This being our view of the law, and the charge of the court being in harmony with this view, and applicable to the facts of the case, we hold it to be correct.

Several objections are urged by appellant's counsel to the court's charge upon the issue of self defense. We shall consider but one of these objections. Among other rules governing self defense the court gave the following: "Homicide, to be justifiable, must be in fact in self defense, and not merely colorably so." This was excepted to at the time it was given. In Babb's case, 8 Texas Court of Appeals, 173, an instruction in almost the very language of the above was held erroneous, because it destroyed all that portion of the charge which permitted defendant to invoke the right of self defense against reasonable apprehensions and expectations of death or some seriously bodily injury. In the case before us, we think the clause of the charge above quoted was well calculated to cause the jury to overlook and disregard that well settled principle of the law of self-defense, that one who commits a homicide is justified in so doing if he acts upon reasonable appearances of danger of death or

serious bodily injury to himself, which reasonable appearances are to be considered and determined from his standpoint. It matters not in such case whether the danger was real; whether it in fact existed, or whether it was merely *colorable*. If, from the defendant's standpoint, taking into consideration all the circumstances of the case, it would reasonably appear to him that he was in danger of death or serious bodily injury from Howard, he had the right to kill him, although in fact such danger did not exist. Each juror must place himself in the position of the defendant, and determine from all the facts as they appeared to him at the time, whether his apprehension or fear of death or serious bodily harm was reasonable; and if so they must acquit. (Marnoch v. The State, 7 Texas Ct. App., 275; Jones v. The State, 17 Texas Ct. App., 612; Jordan v. The State, 11 Texas Ct. App., 447; Brumly v. The State, 21 Texas Ct. App., 240; Bell v. The State, 20 Texas Ct. App., 450; Horbach v. The State, 43 Texas, 242.)

This important principle of the law of self defense is not clearly explained in any portion of the charge of the court, and even if it had been, as was said in Babb's case, it would have been destroyed by the clause complained of, and above quoted. Because of this error in the charge the judgment must be reversed and the cause remanded. In other matters complained of by defendant we perceive no error.

*Reversed and remanded.*