ABNER CHAPMAN v. THE STATE.

*No 1047. Decided December 12.*

Fact Case—Murder of the First Degree—Circumstantial Evidence—Charge on Murder of the Second Degree Not Required Nor Demanded.—See facts stated in the opinion which, though circumstantial in character, are so conclusive of defendant's guilt of murder of the first degree that it is *Held,* that the trial court did not err in refusing or failing to charge upon murder of the second degree.

APPEAL from the District Court of Smith. Tried below before Hon. FELIX J. McCORD.

This appeal is from a conviction of murder in the first degree, the penalty assessed being a life term in the penitentiary.

The case is stated in the opinion.

*John F. Weeks,* for appellant.

*J. M. Edwards,* County Attorney for Smith County, for the State.

HURT, PRESIDING JUDGE.—The appellant was indicted for the murder of Dillard Clark, and convicted of murder of the first degree, and his punishment assessed at confinement in the penitentiary for life. There is but one question suggested by the record in this case: ought the trial court to have charged upon murder of the second degree? In order to a clear understanding of this question, we give the main facts in evidence. We adopt the statement contained in the State's brief, which is a clear, succinct, and graphic account of the facts relied upon by the State. Appellant offered no testimony, except to prove an alibi, which was very weak, and properly disregarded by the jury. The facts are as follows:

"The defendant, a man of about 35 years of age, lived in Cherokee County, in Gourd Neck community. He was the husband of Jack Mixon's sister. Mixon also lived in Gourd Neck, and had a daughter, about 17 years old, named Josie Mixon. About a year before the homicide, defendant and his wife separated, and from about that time defendant was carrying on a clandestine correspondence and having clandestine meetings with Josie Mixon. In the spring of 1894, defendant and Josie Mixon 'ran away,' coming from her home to the city of Tyler, a distance of thirty miles, at night, in a buggy. They occupied the same room at an hotel in Tyler, wherein there was but one bed, and the same circumstance occurred a few days thereafter at Atlanta, Texas, and at Texarkana, Texas. From the latter place Josie Mixon returned home, having been away nearly a week. On account of these facts, Jack Mixon had threatened to kill defendant. After Josie Mixon's return, the clandestine correspondence and meetings between her and defendant continued. Jack Mixon knew nothing of this correspondence and these meetings, occurring either before or after the elopement, but knew only of the elopement. Defendant had succeeded in partially pacifying Mixon, but was apprehensive that the latter would gain further information regarding him and Josie and would then kill him. About a month before the homicide, Josie Mixon, alone, went to a certain 'new ground,' where she met defendant alone. In going to and returning from the new ground, she passed the house in which deceased lived. A day or two after this, deceased had circulated the rumor that Josie and defendant had been 'doing wrong' in the new ground. About three weeks before the homicide,

deceased met Josie Mixon in the road, and told her that he knew all about what she and defendant had been doing, and that, unless she would consent to be as kind to him as she had been to defendant, he would spread over the community what he knew about her and defendant. Josie declined the invitation of deceased. On Monday evening, the 14th day of May, 1894, Josie met defendant clandestinely, and told him all that deceased had said to her, and at the same time delivered to him a letter written by her to him, in which she used this language: 'Dillard Clark says he can tell pa a heap on you and me, but won't now. You had better attend to his case for him. He is a devil.'

"J. D. Clark, the deceased, was a man about 26 years old. He lived also in Gourd Neck, having moved there in the spring of 1894 from Grayson County. He had left in Grayson County a Winchester rifle, a cooking stove, a bedstead, and some mattresses and quilts. Some two or three weeks prior to the homicide, the deceased had been preparing to go to Grayson County in a wagon after his 'things.' On Thursday morning, the 17th day of May, 1894, deceased left the house of Arnet Portwood, with whom he was living, driving a wagon drawn by two medium-sized brown or mouse-colored mules, going to Grayson County after his 'things.' The wagon and mules belonged to deceased. In the wagon, among other things, was a certain quilt. The defendant accompanied deceased in the wagon when it left Portwood's house, and the defendant carried a certain double-barreled shotgun. Deceased, driving the same wagon and team alone, reached Tyler, and put up at the wagon yard, the night of said Thursday, May 17th. In the evening of Friday, May 18th, defendant returned to the house of Arnet Portwood alone, and told Portwood that deceased had tried to get him (defendant) to accompany him (deceased) to Grayson County, but that he (defendant) had refused, and should not do so. On the following Saturday evening, May 19th, defendant left Portwood's house afoot, going towards Jacksonville, a distance of about eight miles, and saying that he was going to Sulphur Springs to engage in work. Before leaving Portwood's, defendant left with Portwood a letter addressed to Miss Josie Mixon. This letter was delivered to her on Sunday, May 20th. It was in response to her letter to him, delivered by her to him on Monday, May 14th, and in this letter defendant wrote that he would 'attend to Clark's case for him.' On Saturday evening, May 19th, defendant arrived in Tyler on the train from Jacksonville at 7:45 o'clock, and went to the wagon yard, where he got with deceased, who was still there. That night about 9 o'clock defendant and deceased left together in the wagon for Grayson County. They went to Grayson County, loaded a cooking stove sitting in a box, a bedstead, some quilts and a mattress, and a 38-caliber Winchester rifle in a leather scabbard, with two leather straps attached to it, into the wagon. With this load, and the double-barreled shotgun defendant had carried with him, they started on their return to Cherokee County.

They passed through Greenville, in Hunt County, Lindale, in Smith County, and on the evening of Saturday, June 2, 1894, were seen and well recognized in the city of Tyler. That night, a little after dark, about two miles southwest from the city of Tyler, and on the road leading directly to Gourd Neck, two men in the same wagon, with the same load, drove out by the side of the road, and struck camp. About 9:30 that night two gunshots were heard a short distance from this camp, in the direction of an oat field. Several seconds intervened between the two shots. About fifteen minutes after the shots were heard, a man riding a mule, and followed by another mule dragging a rope or halter, went at a rapid pace down the road in the direction of Gourd Neck, and saying repeatedly, as he whipped the mule, 'get up.' The next morning, about 7 o'clock, the body of the deceased, J. D. Clark, was found lying on its back in the oat field where the shots were heard. He was wounded in two places. One ball had entered the back of his head, and had come out just over the right eye, and the other ball had entered his left breast just below the nipple, and had come out just under the left shoulder ·blade. A 38-caliber Winchester rifle ball was found imbedded in the ground exactly under where it had come out of deceased's body, just below the shoulder blade.

"At twenty minutes past 4 o'clock on this Sunday morning, June 3rd, defendant walked into the house of Kile Durret, in Gourd Neck, about thirty miles from the city of Tyler. He stated to Durret, who is his brother-in-law, and to Durret's son, that he had last seen deceased at Greenville, where he had left him to come on through in his wagon, and that he (defendant) had come from Greenville on the train, and had gotten off the train at Price Switch, a switch on the International & Great Northern Railway a few miles south from Jacksonville, and had come from the switch on foot. Defendant brought to Durret's house a valise containing some clothing, but nothing else. The pants he wore to Durret's house had on the inside of the legs, below the knees, some brown or mouse-colored hairs. About 3 o'clock Sunday evening, June 3rd, defendant was arrested at Durret's house, and brought to jail at Tyler. Just after he was arrested he whispered to his niece, Miss Nellie Durret, to get his letters. The letters were found under a pillow on the bed defendant had occupied after he arrived at Durret's house before day that morning. They were letters written to him by Miss Josie Mixon, and the same letters that were introduced in evidence before the·jury. On Sunday morning, June 3rd, about 7 o'clock, one of the mules which had drawn the wagon in which deceased and defendant were traveling was found in a much jaded condition in a little prairie about five miles north from Durret's house, in the direction of Tyler. Near the mule was found also, early that morning, the same quilt which deceased had carried with him on said trip. A short distance south from where the mule and quilt were found were seen, about sunup Sunday morning, June 3rd, the tracks

of a man going south in the direction of Durret's house. These tracks were made by a broad, flat shoe, with a very broad heel, about a number 8. About the same time on said morning another witness discovered similar tracks further down the road, about three miles from Durret's house, going in that direction, and followed them incidentally down the road to the northeast corner of the Jordan field. At the southwest corner of the same field the same tracks were again found (having come, evidently, across the field), and from this point were followed until they crossed the Corinne road, and went into a skirt of woods lying east of Durret's premises. In this skirt of woods, during the week beginning June 3, 1894, were found secreted in piles of leaves and brush the Winchester rifle belonging to deceased, which he had brought from Grayson County, the scabbard to the rifle, and one of the straps to the scabbard, and the double-barreled shotgun carried by defendant to Grayson County and back, and a grass rope belonging to deceased which he had carried on said trip. These things were found from forty to seventy-five yards south from the Corinne road, and from twenty to forty steps east from Durret's field fence, and within 200 yards from Durret's house.

"Between daylight and sunup Sunday morning, June 3rd, Miss Nellie Durret was returning home along the Corinne road from Frank Loper's house, where she had spent Saturday night. When she reached the northeast corner of Durret's field she saw a man's track which she had not seen at any other point along the road, and this track she followed to the doorstep of her father's house. She found defendant there on her arrival, and the tracks she traced would be made by just such a shoe as the defendant had on. All of the tracks before mentioned, when seen by the several witnesses, appeared to have been made but a short time. They had been made since the dew had fallen, and were right fresh. When the gun, scabbard, rope, etc., were found in the skirt of woods, the same track apparently was seen going along Durret's fence row from near where the Winchester rifle was found, and traced to the Corinne road at the corner of Durret's field. The other strap belonging to the Winchester scabbard was found early Sunday morning, June 3rd, about three miles from where the mule was found, towards Tyler. On page 50 of the transcript appears a plat explaining the evidence in regard to the tracks and the finding of the various articles. About a week after the defendant was arrested, the other mule was found at the house of a man about twelve miles from Tyler, on the road leading to Gourd Neck. It stopped at this house early Sunday morning, June 3rd, and was then dragging a rope attached to a halter. At the scene of the homicide on Sunday morning, June 3rd, the tracks of a man were traced from the body of deceased towards the wagon, which was standing near the road, about 150 yards from the corpse. These tracks were made by a man running. They were fresh when first found. They were made by a broad, flat shoe, with very broad heel, about a number 8. When the

defendant was arrested and brought to Tyler, he wore the same shoes he wore to Durret's house Sunday morning. One of these shoes was taken from his foot, and compared with and placed into the tracks made by the man running away from the body. The measuring was done with care and accuracy. The shoe fitted the tracks with absolute precision.

"The manner in which deceased was shot, first through the head from behind, and then through the heart while he was on his back in the death agony; defendant's motive to kill him, inspired by jealousy and a desire to prevent the deceased from telling tales of defendant's relation with Josie Mixon; the fact that Josie Mixon told defendant of the indecent proposal made to her by deceased, and of his threat to tell her father all he knew, and suggested to defendant to 'attend to his case; he is a devil;' the fact that defendant left Portwood's house Thursday morning in the wagon with deceased, carrying the shotgun, and returned to Portwood's house Friday, saying that he had refused to accompany deceased to Grayson County, and should not do so; the fact that he left Portwood's house on Saturday, saying that he was going to Sulphur Springs to get work, and came directly to Tyler, where he rejoined deceased, and went on to Grayson County with him, and returned; the fact that just before leaving Portwood's, on Saturday, he clandestinely sent to Josie Mixon a letter saying that he would 'attend to the case' of deceased; the coolness and chicanery by which defendant attempted to conceal his crime—all, in addition to establishing guilt, when taken with the other evidence, show clearly that the killing was with express malice. No weapon was found about the body of deceased. There is not the slightest circumstance suggesting or raising the issue of murder upon implied malice."

There is but little to be said. The facts in this case, as contained in this record, present no issue other than that of murder of the first degree. The person guilty of this crime is guilty of the offense of which appellant stands convicted. The jury have said that appellant committed the deed. Although a case of circumstantial evidence, there is no doubt, nor shadow of doubt, of appellant's guilt. The jury has been lenient with him; and we affirm the judgment of his conviction.

*Affirmed.*

Judges all present and concurring.