BENNETT v. STATE.   (No. 4350.)

(Court of Criminal Appeals of Texas.   Feb. 28, 1917.   On Motion for Rehearing, April 18, 1917.)

1. CRIMINAL LAW ⊜⇒994(4)—JUDGMENT—ENTRY NUNC PRO TUNC.

In view of Vernon's Ann. Code Cr. Proc. 1916, art. 853, making it the court's duty to enter a true record of the judgment rendered, and under the inherent power of the court as

well as Vernon's Sayles' Ann. Civ. St. 1914, art. 2015, authorizing the court to amend the record according to the truth, the court had jurisdiction to enter of record nunc pro tunc a judgment rendered at a preceding term after conviction, but erroneously entered.

**2. CRIMINAL LAW ☞1069(1)—RIGHT OF APPEAL — JUDGMENT RENDERED NUNC PRO TUNC.**

Where the judgment rendered in a criminal case was erroneously entered, defendant's failure to perfect his appeal therefrom did not deprive him of his right to appeal from an entry of judgment nunc pro tunc at a subsequent term.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2691, 2693, 2694, 2698.]

**3. HOMICIDE ☞166(1) — DOCUMENTARY EVIDENCE—DIARY.**

Where in a homicide case the defense was purely self-defense based on threats and apparent danger, and it appeared that the difficulty arose out of relations between deceased and defendant's wife, entries made by the wife in her diary bearing on such relations and read by defendant before the homicide were admissible only on the issue of motive and the state of defendant's mind, and not to establish the existence of any fact recited in the diary.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 320.]

**4. CRIMINAL LAW ☞396(2) — EVIDENCE — DIARY.**

Under Code Cr. Proc. 1911, art. 811, providing that, when part of a writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, and that when a writing is given in evidence, any writing necessary to make it fully understood may also be given in evidence, where defendant in such case claimed to have drawn certain inferences prior to the homicide from marks made in connection with certain entries, and introduced some of the entries, the state was entitled to introduce such other of the entries as tended to throw light on whether defendant drew or was justified in drawing such inferences.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 862.]

**5. CRIMINAL LAW ☞396(2) — EVIDENCE — DIARY.**

In such case it was error to permit the state to introduce an entry which was not accompanied by any of the marks described by defendant from which he drew his inferences, particularly where it appeared that deceased was not mentioned in such entry.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 862.]

**6. CRIMINAL LAW ☞396(2)—EVIDENCE—ENTRIES IN DIARY.**

The entries in such diary were not part of the same writing within Code Cr. Proc. 1911, art. 811, so that the introduction of part by defendant authorized the introduction of the whole by the state, where each entry bore a separate date and was complete in itself.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 862.]

**7. WITNESSES ☞191 — PRIVILEGED COMMUNICATIONS—DOCUMENTARY EVIDENCE—HUSBAND AND WIFE.**

Under Code Cr. Proc. 1911, arts. 794, 795, relative to privileged communications between husband and wife, and inhibiting husband and wife from testifying against each other in criminal cases, except in a prosecution for an offense committed by one against the other, it was error to admit in evidence an entry in such diary of the defendant's abuse and ill treatment of his wife.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 738.]

**8. CRIMINAL LAW ☞419, 420(12)—DOCUMENTARY EVIDENCE—HEARSAY.**

Such diary entry was further objectionble as hearsay evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 980–983.]

**9. WITNESSES ☞191—HUSBAND AND WIFE—DOCUMENTARY EVIDENCE—DIARY.**

Entries made in such diary after the homicide showing the wife's fear that defendant would be acquitted, and desire for his conviction, were not admissible, since they were not only hearsay and did not operate upon defendant's mind when he killed deceased, but were inhibited by Code Cr. Proc. 1911, arts. 794, 795.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 738.]

**10. HOMICIDE ☞300(7) — INSTRUCTIONS — SELF-DEFENSE—APPARENT DANGER.**

Where in a homicide case the evidence showed that deceased did not have a deadly weapon in his possession when he was killed, and the defense was purely self-defense, based on threats and apparent danger, and the charge on self-defense did not sufficiently present the issue of apparent danger, and an instruction was given on the presumption arising from the use of a deadly weapon by deceased, it was error to refuse an instruction that, if it appeared to defendant, viewed from his standpoint, that deceased was about to shoot him, he was justified in the killing, though the jury might believe that defendant was in no danger of being shot, and though deceased was unarmed.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 622.]

On Motion for Rehearing.

**11. HOMICIDE ☞300(7) — INSTRUCTIONS — SELF-DEFENSE — APPARENT DANGER — THREATS.**

Where in a homicide case defendant claims self-defense based on threats and apparent danger, the court should charge not only upon self-defense from the standpoint of threats, but should charge on self-defense viewed in the light of apparent danger, independent of the question of threats.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 622.]

Appeal from District Court, Bexar County; W. S. Anderson, Judge.

E. L. Bennett was convicted of manslaughter, and appeals. Reversed, remanded, and rehearing denied.

C. A. Keller, R. H. Ward, John H. Bickett, Jr., and W. S. Anthony, all of San Antonio, for appellant. D. A. McAskill, Dist. Atty., and Joe H. H. Graham, both of San Antonio, and E. B. Hendricks, Asst. Atty. Gen., for the State.

MORROW, J. Charged with the murder of E. G. Millikan, the appellant was convicted of manslaughter, the jury assessing his punishment at confinement in the penitentiary for a term of three years.

Appellant's trial began April 10, 1916, and verdict was returned April 19, 1916. On April 22, 1916, appellant's motion for new trial was overruled, and the judgment was entered and sentence pronounced, which, according to the minutes of the court, condemned him "to be confined and imprisoned for the period of three years in accord-

ance with the provisions of law governing the penitentiaries of this state." Appellant excepted to the judgment and gave notice of appeal to this court, which was duly entered of record in the minutes of the district court on the 22d day of April, 1916. On the 1st day of November, 1916, 194 S. W. 145, this court dismissed appellant's appeal on the ground that it had no jurisdiction because he had failed to enter into a recognizance as required by law. The term of court at which appellant was convicted finally adjourned on the 29th day of April, 1916. On the 28th of December, 1916, at a subsequent term of the same court in which he was convicted, appellant filed a motion seeking to correct the judgment so as to give him the benefit of the indeterminate sentence law. Responding to this motion, the state filed a reply affirming that the judgment and sentence were valid; and in the alternative the state asserted that the appellant had been properly sentenced and the judgment properly rendered at the term at which he was convicted, and that the judgment and sentence entered in the minutes at that time were not in accord with the judgment entered, and concluded with the following prayer:

"The state further prays and moves the court to here and now enter an order directing the clerk to spread upon the minutes the true judgment and sentence heretofore rendered herein on, to wit, the 22d day of April, 1916, and so enter said judgment and sentence nunc pro tunc."

The court on hearing found as a fact that the judgment and sentence entered in the minutes of the court on April 22, 1916, did not truly record the judgment rendered and the sentence pronounced. The record of the judgment of the court and sentence of appellant were on the 30th day of December, 1916, entered so as to condemn the appellant to confinement in the penitentiary for a term of not less than two nor more than three years, and appellant at the time gave notice of appeal to this court, which was also entered of record at said date.

The state insists that appellant has no right of appeal in this case, and that the holding in the case of Perales v. State, 76 Tex. Cr. R. 69, 172 S. W. 790, and other cases, wherein it is held that a judgment and sentence in form similar to that originally entered in this case were appealable to and amendable in this court, concludes the matter against appellant.

[1] These authorities do not settle the controversy in this case, for the reason that the judgment entered April 22, 1916, is not the judgment upon which the state is now relying. If this court had acquired jurisdiction on the appeal, it would doubtless have regarded it as expressing the true judgment rendered, and on the authority of the cases mentioned above, and that of Robinson v. State, 58 Tex. Cr. R. 558, 126 S. W. 276, and

the statutes therein cited, and of Ex parte Beeler, 41 Tex. Cr. R. 240, 53 S. W. 857, have reformed the judgment, if it found no error requiring its reversal. The state proposes to confine appellant in the penitentiary by virtue of the judgment entered December 30, 1916, and for that reason there is presented a question different from that which was before the court in the cases above mentioned. According to the entry in the court's minutes of December 30, 1916, the judgment rendered on the 22d day of April, 1916, was not entered of record. It is true that at that time the deputy clerk wrote upon the minutes what purported to be the judgment of the court, but the court on December 30, 1916, judicially determined that the judgment so entered did not speak the truth, and, to the end that the proper judgment might be entered of record, he directed the entry of the true judgment of the court at that time. It was the court's duty to enter in the minutes of the court a true record of the judgment rendered. 2 Vernon's Crim. Statutes, art. 853. Failing to make such record at that time, article 2015, Vernon's Civil Statutes, gave the court authority to amend the record according to the truth. This authority existed by the inherent power to so correct its minutes at a subsequent term. Burnet v. State, 14 Tex. 455, 65 Am. Dec. 131; Rhodes v. State, 29 Tex. 188; Ximenes v. Ximenes, 43 Tex. 458; Coleman v. Zapp, 105 Tex. 491, 151 S. W. 1040; Michie's Civil Digest, vol. 11, p. 106, and cases cited in Cyc. vol. 11, p. 764; authorities cited in note Wardell v. Williams, 62 Mich. 50, 28 N. W. 796, 4 Am. St. Rep. 820; Chester v. Graves, 159 Ky. 244, 166 S. W. 998, Ann. Cas. 1915D, 678, and note 681, citing numerous cases from various jurisdictions. It follows that the action taken by the trial court on December 30, 1916, was within its jurisdiction.

This last entry expressing the final judgment of the court, is appellant deprived of his right to appeal therefrom by reason of the fact that he failed to perfect his appeal from the entry made at the previous term? A very similar question was before the Supreme Court of this state in the case of Palmo v. Slayden Co., 100 Tex. 13, 92 S. W. 796. In that case Palmo was on November 13, 1903, awarded a verdict in the district court of McLennan county for $9,000 and over. The trial judge noted the fact that the verdict had been rendered upon his docket, but no judgment was written on the minutes. On October 24th, at a subsequent term of the court, Palmo sought to have judgment entered nunc pro tunc for the amount awarded him by the jury. No statement of facts nor bills of exception were filed by the party cast in the judgment until after the judgment nunc pro tunc was entered. The question was thus presented whether or not the entry of the judgment nunc pro tunc about a year after the judgment had been

rendered was the end of the trial, and the date from which the time would be counted within which statement of facts and bills of exceptions should be filed as the basis of appeal. The Supreme Court held that the statement of facts and bills of exception filed within the statutory time after the entry of the judgment nunc pro tunc were filed within time, and could be used as a basis for review of the action of the court upon the trial as originally had, citing Hill v. State, 41 Tex. 255; Sabine & E. T. Ry. Co. v. Joachimi, 58 Tex. 454; Jenks v. State, 39 Ind. 1. The Supreme Court said:

"The construction which the foregoing cases have placed upon the terms of statutes similar to that under consideration, we think, fully justifies the conclusion we have reached, that the entry of judgment nunc pro tunc was a part of the trial of the case, and that after that judgment was entered the parties had a right to have a statement of facts made up and filed upon which to prosecute their appeal.

In the case of Mapes v. State, 13 Tex. App. 89, it is held that the entry of a judgment nunc pro tunc was so essentially "a part of the trial" as to vitiate the judgment nunc pro tunc entered in the defendant's absence.

From the opinion in Scott v. State, 26 Tex. 117, we take the following:

"We are of opinion that the motion to dismiss the appeal ought not to prevail. It has been the constant practice of this court to entertain appeals in criminal as well as in civil cases, where, as in this case, the court, having omitted to cause the entry of the judgment to be made at the proper term, had caused it to be entered nunc pro tunc at a subsequent term. Otherwise the right of appeal might be defeated by the failure of the court to correct at the term a clerical omission."

In the case of Railway Co. v. Whorley, 74 Ala. 265, the question of the right to appeal from a judgment nunc pro tunc, which judgment corrected omission in the original judgment entry, was passed upon in the affirmative, the court holding that the entry of the corrected judgment was the end of the trial.

In a California case, Ward v. Dunne, Judge, 136 Cal. 19, 68 Pac. 105, the question of the right of a party convicted of felony to appeal from a judgment nunc pro tunc and have the entire case reviewed was affirmed. In that case a judgment had been entered at a previous term of court, but it was incorrectly entered. Subsequently a judgment nunc pro tunc was entered correcting the errors in the former judgment. The appeal was prosecuted from the order entering the last-mentioned judgment, and the right of the appellant to this appeal was sustained.

It is urged by the state that an appeal from a judgment entered nunc pro tunc is not maintainable except in cases where it is entered in lieu of a void judgment, or in cases where no judgment is entered at all. Article 859, C. C. P., provides that, where there is a failure to enter judgment or pronounce sentence upon conviction during the term, judgment and sentence may be pronounced at any succeeding term. We think there is no doubt

of the court's power to enter a judgment nunc pro tunc independent of this statute. However, it is difficult to understand why the facts of this case should not bring it under the terms of the statute last mentioned. In the case of Coleman v. Zapp, 105 Tex. 491, 151 S. W. 1040, the Supreme Court sustained the entry of a judgment nunc pro tunc after six years in a case where there had been an omission in the original judgment of an item of $1,800; and, as we understand the case of Rios v. State, 183 S. W. 151, it construes article 859 to apply to a case where there is a judgment written on the minutes which does not in fact express the judgment rendered. In the Rios Case the judgment originally rendered inserted the name of Clarence Lenier instead of Jeorge Rios, the defendant on trial. After a dismissal of the appeal the judgment was amended by rewriting in the minutes of the court a correct entry. This court held that, under article 859, this was proper procedure.

The state's counsel insists that the case of Offield v. State, 61 Tex. Cr. R. 340, 135 S. W. 568, is decisive of this case, and that because thereof it should be held that his right of appeal did not exist. The Offield Cases, 61 Tex. Cr. R. 340, 135 S. W. 568, and Id., 61 Tex. Cr. R. 585, 135 S. W. 566, construed articles 882 and 883, and followed numerous prior decisions of this court in holding that, under the peculiar language of these articles of the statutes, it was necessary to enter notice of appeal at the time the conviction was had, and that it could not be entered afterwards. Nothing was involved in the cases except the bare question, which had previously been repeatedly decided, that the notice of appeal, although given at the term when the verdict was rendered could not, owing to the peculiar verbiage of the statute relating to notice of appeal, be subsequently entered.

The case of Smith v. State, 1 Tex. App. 408, holding that an appeal will lie from a judgment entered nunc pro tunc, was decided long prior to the time that the Offield Cases were decided. The last-named case does not question its correctness.

In our judgment, the rule that, where a final judgment nunc pro tunc is entered, it is the conclusion of the trial from which the defendant may prosecute an appeal, is not modified by the case of Ex parte Strey, 28 S. W. 811, nor Ex parte Beeler, 41 Tex. Cr. R. 240, 53 S. W. 857. If the true judgment rendered by the court had been that indicated by the minutes of April 22d, the judgment would not have been void, but irregular, and on appeal to this court would have been corrected. The Beeler Case, supra, recognizes the correctness of the procedure in this case, but in no way modifies the right of the trial court when it determined that the first judgment entered did not speak the truth and directed that the judgment be cor-

rectly entered, and that the entry then made was the record of the final judgment, which ended the trial, and from which the appeal could be prosecuted.

[2] There being nothing in the record to show that appellant has not been in custody since the entry of the final judgment, the question of escape does not arise. In our opinion, the jurisdiction of this court is properly invoked, and it becomes its duty to pass upon the questions presented by the record relative to the trial of the case.

Appellant shot and killed the deceased, Millikan, in San Antonio, Tex., on August 21, 1915. The deceased and appellant had been acquaintances for some years before the homicide, and for two or three years prior to the fall of 1913 had been intimate friends and more or less associated in business transactions, and through these business transactions the deceased had become indebted to the appellant for a sum amounting to several thousand dollars. During the spring of the year 1913 the appellant began to entertain suspicions that the relations between deceased and appellant's wife were too intimate, and forbade his wife to go to Sutherland Springs in company with the deceased, giving as a reason therefor that it would injure her reputation, and appellant testified that he was in a hospital at the time of this conversation, having undergone an operation, and his wife insisted that she would go with the deceased, and that while he was still in the hospital the deceased came to him and said:

"I understand you are talking about my reputation."

The defendant said:

"I have said certain things. Don't you ever come to my house again. Don't ever come to see my wife, my mother-in-law, and my children. Keep away from my house."

To which the deceased replied:

"Mr. Bennett, that is a damned insult, and as soon as you can stand up we will fight it out. When you get up, we will go out in the sticks and shoot it out until one of us is dead."

On September 5, 1913, appellant wrote to deceased the following letter:

"As you have ignored my oral request to keep away from my home and my wife, I now notify you in writing that I forbid you to visit my home, my wife, or any member of my family or to meet them in public or private, or to phone them, write them, or have any communication or conversation with them, directly or indirectly. Any disregard of this notice will be at your peril."

There was evidence that the deceased was a frequent visitor at the appellant's home, and up to the spring of 1913 these visits occurred both when he was present and during his absence. There was evidence also that the deceased and appellant's wife went to various places of amusement together, went to Sutherland Springs and went in bathing together, and one witness testified that he saw them in a rooming house together; all of which was brought to appellant's attention

before the homicide. In August or September, 1913, appellant's wife sued him for a divorce, and, as we understand the record, he filed a cross-bill making countercharges, and that he left his home about this time or shortly after and that the deceased continued to visit his home after appellant's separation from his wife. Appellant claimed that after the separation he had met his wife and the deceased and appellant's adopted daughter on the street, and that the daughter had been sick, and appellant stopped to talk to her, and that the deceased interfered, and in the course of the conversation said to appellant, "You are going to get hurt;" to which appellant replied, "Who is going to hurt me?" And deceased said, "I am; pull your damned gun and we will shoot it out." Appellant said, "I have no gun." Deceased said, "You had better get yourself one; the next time we meet, one of us has got to die." Appellant claims that this was the last time he met deceased before the homicide. The evidence showed that after the defendant warned the deceased to keep away from his premises in the spring of 1913 the deceased and appellant and appellant's wife met at appellant's house and in a manner patched up their differences. Judge C. A. Keller, the attorney representing appellant in his divorce proceedings, testified that on December 12, 1914, he had communicated to appellant a message that deceased had given him about that time, as follows, "You had better tell your client I am going to see the madam and spend the evening with her." There was evidence that the deceased knew of appellant's suspicions with reference to the conduct of deceased and appellant's wife, and that appellant resented it and was endeavoring to procure proof of their illicit intercourse.

The state's eyewitnesses testified that at the time of the homicide the deceased was standing on the sidewalk near a post reading a newspaper, that he was leaning up against the post, and that while the deceased was reading the newspaper the appellant shot him three times.

Appellant's version of the affair was as follows:

"The next morning, the 21st, I didn't sleep very much. I was sick most all night, and I got up. I slept the latter part of the night. I must have got up about 6 o'clock, maybe 6:15, along in there, got up, shaved, and dressed, and went downstairs, my intention being to take a street car or jitney across over to the Southern Pacific Depot, where my customer was, and sell him, but when I got downstairs and paid my bill and stepped out on the street there was no street car there and no jitney in sight. I hadn't had breakfast, so I stood in the doorway a few minutes, so I thought I will go over to the Brown News Company and get breakfast. The Brown News Company is situated in the International & Great Northern depot. They have a nice lunch counter there, and as I stepped off the sidewalk going over cater-cornered towards the International & Great Northern depot—I mean stepped off the door step—I had taken probably two or three steps when a man

came walking around the corner; had a newspaper in his hand, opened out. He went around the corner and looked up, and we saw each other simultaneously, and it was Mr. Millikan. He immediately made a quick move with his paper and jerked off his glasses, and the thought passed through my mind is now, it all came in a second, one of us had to die the next time we met, and I thought like that, to me, 'This is the shooting,' and I quickly pulled the revolver from my coat pocket and shot. I just shot once then, and apparently it missed him; at least it didn't have any effect on him; and he made a very quick jump over to the edge of the sidewalk and got behind a couple of steel or iron posts that were there. Then the thought occurred to me, 'Now he is going to get me from ambush,' so I stepped forward again to get a little bit to one side, and shot twice more, very close together. I could see the effect of this immediately. He sort of sagged down. He grabbed the post with both hands and straightened himself, and I realized then that if he had a revolver in his hand he must have dropped it in the gutter. He jumped across the gutter and jumped back. It occurred to me then I was beyond danger; I saw he was not going to shoot me because he had been hit. I lowered my gun and stood looking at him. He looked me square in the eye, and then he turned and ran."

On cross-examination of the appellant by the state, when asked for his reasons for his suspicions with reference to the relations between his wife and the deceased, he testified as follows:

"And I got hold of some of her own writing in which she herself said she had been out riding at night. That was minutes she had made. I suppose you would call it a diary. I took those diaries when I left there. They are in the hands of my attorneys. I found a great many different things in those diaries. I found where he always made it a point to call at my house when I was absent. I can't remember the days and dates on which those visits are recorded from memory; it would be impossible; there were hundreds of them."

He also said:

That there were different markings which he considered to mean certain things; that they were private marks in her book. "They never appeared except when she went out riding with Mr. Millikan and he was at the house, and they always appeared when he was there, and I considered them to be records of their illicit intercourse; I believed them to be, and I still believe them to be. I found those records nearly every time Millikan was at the house alone. Those markings were asterisks. Sometimes that kind of a marking, and sometimes that kind of a marking."

After the appellant had given the above testimony on cross-examination, he introduced in evidence 40-odd entries from his wife's diary. These entries were between the dates of March 29, 1910, and December 3, 1911, inclusive. These entries were in books kept by appellant's wife, and each entry was separate and bore a separate date. There were in the same book and other books separate entries on different dates covering practically every day between February, 1910, and April 13, 1916, which was after the trial of this case began. After the appellant had introduced in evidence the 40-odd items mentioned, the state introduced the several books containing all of the other entries therein, including entries up to April 13, 1916.

Among the bills presenting objections to this evidence is bill No. 5, from which it appears that the state introduced and read to the jury an entry from the diary of April 2, 1911, in which, among other things, appears the following:

"Ed has abused me outrageously, and should any trouble arise he would try to win sympathy, and I must have some evidence. He began when I was in a family way with Leo. He insulted me in the most terrible fashion. He has been overbearing and cross. My life has been hell sometimes. To-day he was so mad that he reminded me that he pays for my grub and the house I live in."

Another bill, No. 7, shows the state introduced from the diary another, dated April 10, 1916, containing the following:

"Well, to-day the trial began. I suppose Ed will be turned loose. All murderers are here unless they are negroes or Mexicans."

And on the 12th of April an entry containing the following:

"This has been a stormy old day for me. I am all unstrung and half sick, but quite hopeful. I am so anxious about the case. The outlook is pretty good, but I am afraid Ed will go free, just because I have heard of so many murderers going free."

And on the 13th of April another entry, from which the following is taken:

"I am still very hopeful, but I am also prepared for the worst, that is, his release, but I cannot believe the jury will ever acquit him if there has been no crooked work done."

The qualification to this bill shows that these entries in bill No. 7 were not read to the jury, but that the books containing them were in evidence and were passed among the jury.

These bills were further qualified with the following statement:

"The defendant, Bennett, as a witness in his own behalf, read each of these [42] entries to the jury. In so reading them to the jury he called particular attention to certain marks appearing therein opposite certain of the entries read. These marks he designated as 'a cross,' 'an asterisk,' 'a circle,' etc. He stated that these marks did not appear except opposite entries where Millikan, the deceased, was mentioned by name, and that they always so appeared when Millikan's name was mentioned. The defendant then stated that on the presence in the diary of these marks in conjunction with the mention therein of Millikan's name he drew the conclusion that said marks indicated, and were a record kept by Mrs. Bennett hereof, there on the dates when they appeared Millikan had had sexual intercourse with Mrs. Bennett. This was establishing facts relied on by the defendant to justify his act in killing Millikan, by the indirect testimony of the wife through the memoranda and symbols made by her.

"The state then proposed, by the same means, that is, by introducing other entries from the same diaries, to show: (1) That the marks described by defendant, Bennett, did not always appear when Millikan's name was mentioned; (2) that they appeared when his name was not mentioned; (3) that his name was mentioned when they did not appear; (4) that they appeared when the names of other men were mentioned with whom the defendant did not claim that Mrs. Bennett was criminally intimate; (5) that they appeared when the names of women were mentioned; (6) that they appeared when the name of Bennett himself was mentioned; (7) that some of the entries showed on their face that Millikan's visits on the date of the entry was for a definite purpose other than that

of visiting Mrs. Bennett; (8) that the marks referred to appeared in the diaries on dates subsequent to the death of Millikan, and that therefore these marks could not be a record showing Mrs. Bennett's illicit relations with Millikan. And the court allowed the state to do this: (1) Because the entries in the diary introduced by the state were parts of the same written instrument, other parts of which had theretofore been introduced in evidence by the defendant; (2) because the proof made by the introduction of these entries introduced by the state was in the nature of legitimate cross-examination of the wife on matters already brought out by the defendant."

Another bill touching these entries in the diary contains about 250 pages in the record, including many hundreds of these entries, a large number of them made after the homicide. This bill is qualified with the statement that the entries were not read "to the jury nor by the jury," but that the books were passed among them. On account of this qualification we will not discuss this bill further than to say that, if the matter was properly presented, we would hold that none of the entries in the diary of dates subsequent to the homicide were admissible.

[3, 4] The only theory upon which any of the entries in the diary was admissible was upon the issue of motive and the state of defendant's mind at the time of the homicide. None of them was available to either side to establish the existence of any fact recited in the diary, but, inasmuch as appellant claimed to have drawn certain inferences from marks made in connection with these entries, and it appears that he obtained this information before the date of the homicide, and he having introduced some of these entries, the state was entitled to use such other of the entries as were calculated to throw light upon the question of whether appellant drew or was justified in drawing the conclusions from them that he claimed to have drawn. This right we think the state had by virtue of article 811, C. C. P., which we quote as follows:

"When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as, when a letter is read, all other letters on the same subject between the same parties may be given. And when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence"

—and in consequence of the construction placed upon this article by the decisions of this court in Watts v. State, 75 Tex. Cr. R. 330, 171 S. W. 203, and other cases cited in Vernon's Ann. C. C. P. pp. 759 and 761.

[5] In our opinion, this right of the state, however, was limited to such matters as were calculated to throw light upon the issues named, and we are at a loss to understand how the entry of April 2, 1911, set out in bill of exceptions No. 5, serves this purpose. It is not shown that this entry was accompanied by any of the marks described by appellant from which he drew the infer-

ences mentioned, and it appears from the bill that the deceased was not mentioned in this particular entry.

[6] In our opinion, the entries in the diary were not a part of the same writing in the sense that that term is used in the article of the Code quoted. Each entry bears a separate date and is complete in itself.

[7, 8] Nothing in the entries introduced by appellant, even if they had been testified to by appellant's wife as a witness in his behalf, would have justified a cross-examination which drew out the matters complained of in bill of exceptions No. 5, which we have quoted above. That they were calculated to bring the appellant into great disfavor with the jury is apparent upon their face. That they were damaging statements coming from a witness who under articles 794, 795, C. C. P., was not competent to testify against him. We quote the statutes, as follows:

Article 794: "Neither husband nor wife shall, in any case, testify as to communications made by one to the other, while married; nor shall they, after the marriage relation ceases, be made witnesses as to any such communication made while the marriage relation subsisted, except in a case where one or the other is prosecuted for an offense; and a declaration or communication made by the wife to the husband, or by the husband to the wife, goes to extenuate or justify an offense for which either is on trial."

Article 795: "The husband and wife may, in all criminal actions, be witnesses for each other; but they shall, in no case, testify against each other, except in a criminal prosecution for an offense committed by one against the other."

Privileged conversations between the appellant and his wife are given in the statement, and the whole of it is hearsay of a pronounced character. Hamilton v. State, 36 Tex. Cr. R. 372, 37 S. W. 431; Stiles v. State, 44 Tex. Cr. R. 143, 68 S. W. 993.

[9] The reasoning which justified the introduction by the state of such of the entries in the diary as were calculated to throw light upon the correctness of appellant's inferences does not obtain with reference to those entries which were made subsequently to the homicide. These did not operate upon appellant's mind at the time he killed deceased. They were inhibited by articles 794, 795, C. C. P., and by the rule against hearsay testimony.

As stated above, we omit any discussion of the many entries which are referred to in bill of exceptions No. 10, because of the qualification to that bill mentioned, and they form no basis for the conclusion reached with reference to the disposition of this case.

Having reference to those only which are mentioned in bill No. 7 and quoted above, it appears that the jury was informed that the appellant's wife was watching the progress of the trial; that she hoped for his conviction; that she feared his acquittal; that she regarded him as a murderer. This information was given to the jury, not upon the cross-examination of any witness put upon the stand by the appellant, nor was it gleaned from a diary made by his wife con-

taining entries which came to his knowledge before the homicide, but was from written unsworn statements made by a witness who, under the laws of this state, was prohibited from giving testimony of the appellant's guilt. Its admissibility, in our judgment, can be sustained upon no rule of evidence. It is true that the record indicates that appellant introduced one of the entries in the diary which are referred to in bill of exceptions No. 10. If the state had opposed the introduction of this entry upon the ground that it was hearsay, the court should have sustained the objection, but its introduction does not cure or justify the error committed by the court in admitting in evidence the other entries discussed. Nothing in it if it had been given in testimony by appellant's wife would have made the entries set out in bill of exceptions No. 7 and quoted above admissible upon cross-examination.

From what we have said it is apparent that, in our opinion, the court committed error in permitting the use of the diary in the respects mentioned because it was not only hearsay, but prohibited by the statutes which declare that the testimony of the wife cannot be used to criminate her husband, and that confidential communications between husband and wife are privileged. Woodall v. State, 58 Tex. Cr. R. 513, 126 S. W. 591; Brock v. State, 44 Tex. Cr. R. 335, 71 S. W. 20, 60 L. R. A. 465, 100 Am. St. Rep. 859; Eads v. State, 74 Tex. Cr. R. 628, 170 S. W. 145; McDonald v. State, 73 Tex. Cr. R. 125, 164 S. W. 831; Pace v. State, 61 Tex. Cr. R. 436, 135 S. W. 379; Miller v. State, 65 Tex. Cr. R. 305, 144 S. W. 239; Spivey v. State, 45 Tex. Cr. R. 496, 77 S. W. 444; Downing v. State, 61 Tex. Cr. R. 519, 136 S. W. 471; Vickers v. State, 154 S. W. 578.

The court submitted the issue of self-defense and threats and charged the substance of the statute on the presumption arising from the use of a deadly weapon by the deceased. These charges were as follows:

"A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant. If from the evidence you believe the defendant killed the said E. G. Millikan, but further believe that at the time of so doing the deceased had made an attack on him, which, from the manner and character of it and the relative strength of the parties and the defendant's knowledge of the character and disposition of the deceased, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that, acting under such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him; and if the deceased was armed at the time he was killed and was making such attack on defendant, and if the weapon used by him and the manner of its use were such as were reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder or to inflict serious bodily injury upon the defendant."

"If you believe from the evidence that deceased, E. G. Millikan, had threatened to take the life of defendant, or had threatened to do him some serious bodily injury, and you further believe from the evidence that at the time of the homicide deceased, E. G. Millikan, did some act which caused defendant to believe or apprehend that his life was in danger, or his person was in danger of serious bodily injury, viewed from defendant's standpoint alone at the time of the shooting, under such circumstances defendant would have the right to shoot and kill deceased, and would be guilty of no offense, and your verdict should be 'not guilty.' "

[10] There was no evidence that the deceased had a deadly weapon in his possession at the time he was killed. The evidence negatives this position. Appellant's defense was purely self-defense upon threats and apparent danger. The appellant requested the court to give the following special charge:

"If you believe from the evidence that the defendant shot and killed the deceased, E. G. Millikan, yet if you believe that at the time the defendant fired the fatal shots, it reasonably appeared to him, from the circumstances of the case, viewed from his standpoint, that the deceased was then about to shoot him with a pistol, he was justified in killing the deceased, although in fact you may believe from the evidence that the defendant was in no danger at the time of being shot by the deceased, and though you may further believe from the evidence that the deceased at the time of the killing was unarmed, and if you so believe you should acquit the defendant, and so say by your verdict."

The charge on self-defense did not sufficiently present to the jury the issue of apparent danger; and in view of this fact and the fact that the court instructed the jury on the presumption arising from the use of a deadly weapon by the deceased in the absence of any testimony showing that he had a weapon, we think rendered it improper for the court to refuse to read to the jury the special charge above quoted. Such special charge, in our opinion, under the circumstances, should have been given in order to properly safeguard appellant's rights, and its refusal was error.

The assignments which have not been discussed have been considered. They present no reversible error.

For the error in refusing the special charge above mentioned and the admission of the testimony complained of in bills of exceptions Nos. 5 and 7, it is ordered that the judgment of the lower court be reversed, and the cause remanded.

On Motion for Rehearing.

PER CURIAM. Rehearing denied.

DAVIDSON, P. J. (concurring). Reviewing this case in the light of the state's motion for rehearing, I am fully persuaded that the original opinion written by Judge MORROW is correct. I do not care to discuss the matters, in regard to the introduction of parts of the diary of appellant's wife, held to be reversible in the original opinion.

The state ought not to be heard to insist upon the right to use those entries expressing her opinion of her husband's guilt and her wish or desire for his conviction. It certainly cannot be the law that she could give her opinion of his guilt, much less her earnest desire for his conviction, as was shown by such entries. Those entries criticizing courts and animadverting upon the juries of Bexar county for what she thought to be their derelictions in the acquittal of parties accused of crime and expressing her anxiety and hope for the conviction of her husband and doubt of his conviction on account of those matters were not admissible. These could not be evidence against appellant from any witness, much less from his wife. She could not have testified to these matters had she been placed upon the stand. That this was a grave and serious error will not admit of doubt. She may have believed him guilty and desired his punishment, and may have felt outraged at acquittals of accused persons in Bexar county, but her opinions and feelings could not be shown in evidence. I wish to make these few observations in agreeing to the reversal and in overruling the motion for rehearing.

I wish to make a few observations with reference to the charges of the court and the refusal of special instructions requested by appellant. These charges are sufficiently quoted by Judge MORROW in his original opinion. It will be observed in reading those charges that the court gave first a general abstract definition of self-defense which made no application to the facts. It will be noticed further that, applying the law to the case, he limited the consideration of the jury to an actual attack, and one "which, from the manner and character of it and the relative strength of the parties and the defendant's knowledge of the character and disposition of the deceased, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that, acting under such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him," etc. The court further instructed the jury that, if in making such attack the weapon used by deceased and the manner of its use was such as was reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder or to inflict serious bodily injury. It will be discovered from this charge that the jury was limited to an actual attack; second, to the relative strength of the parties; and, third, that if the weapon used by him was such as was reasonably calculated to produce death or serious bodily harm, then the law presumes that he intended to kill. This charge does not present correctly the rule of apparent danger, therefore the charges requested by appellant presenting that matter should have been given. The evidence does not disclose an actual attack on appellant. Self-defense

was predicated alone upon apparent danger, and also as viewed in the light of threats. There is no evidence that deceased had a pistol. If he had and exhibited it, we would have presented a different question. Appellant relied upon threats to take his life and a demonstration as he thought to draw a weapon.

The question of relative strength of the parties did not enter into the case, and there is no possible phase of the evidence which would authorize the court to submit this issue; they were not in physical encounter. The question of the relative strength of the parties may sometimes become an important matter, but not under the circumstances found in this record. Upon another trial the jury should be instructed upon apparent danger, and the question of relative strength of the parties omitted as well as that clause of the charge which instructed the jury as to the effect of the use of a deadly weapon. Sometimes it may be a close question as to whether or not a charge should be given with reference to the use of a deadly weapon, but under the facts of this case the charge was not justified, and it tended to turn the consideration of the jury upon an issue not raised. Had deceased drawn and attempted to shoot a pistol, the question of real danger would have been raised, and the charge on actual danger called for and justified. But such issue was not in the case.

The court gave a rather restrictive and limited charge on threats which, in the judgment of the writer, should be amplified upon another trial. This charge, it will be noticed, confined appellant's rights to the belief of the jury as a predicate for their finding. This was error. It is the belief of the accused which furnishes the criterion. This applies as well to the question of the acts of the deceased. It is the belief of the accused that his life was in danger or his body of serious injury, viewed from his standpoint, which is the basis of our law under such circumstances. The acts and demonstrations, in view of threats by deceased, are viewed from the defendant's standpoint at the time he acted, and if the defendant believed those things, he was entitled to act the same as if they were true. What the jury may believe in the light of the testimony showing that deceased had no pistol is not the criterion, nor is their belief in the light of subsequent developments the criterion. It is the belief of the defendant, who is being tried for his life and liberty, under all the circumstances as they presented themselves to his mind at the time he acted, that should govern the jury in determining guilt. The jury may not, but the defendant may, have believed those things, and it is his belief by which the jury should be governed in rendering their verdict.

[11] There is another question to which I call attention. The court charged self-defense from the standpoint of threats. There

should be upon another trial a charge given upon self-defense viewed in the light of apparent danger independent of the question of threats. The writer does not care to enter into a discussion of this question. In reference to the charge on threats being submitted from the defendant's standpoint, the authorities will be found collated in Mr. Branch's Criminal Law, §§ 447 and 482. That self-defense charge should have been independent of and disconnected from threats, see Branch's Criminal Law, § 482, for collated authorities. As to the question of charging upon apparent, and not actual, danger, where apparent danger only is in the case, see Branch's Criminal Law, §§ 443 and 444, for cited cases. For self-defense from defendant's standpoint, and especially from apparent danger and threats, see Bell v. State, 20 Tex. App. 450, and Spearman v. State, 23 Tex. App. 224, 4 S. W. 586.

Briefly I have written these as some of the reasons why I concur in the reversal of the judgment, and so write in overruling the motion for rehearing.